THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES W. TAYLOR, Defendant-Appellant.

(No. 53806;

First District—April 28, 1971.

Gerald W. Getty, Public Defender, of Chicago, (George L. Lincoln and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Terry M. Gordon, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, James W. Taylor, was indicted and tried on charges of rape, deviate sexual assault, and armed robbery. After a trial by jury he was convicted of armed robbery and sentenced to serve 5 to 10 years in the Illinois State Penitentiary.

On appeal, the defendant contends that he was not proved guilty beyond a reasonable doubt, that he did not receive a fair trial, that the jury was improperly instructed, and that the jury rendered inconsistent verdicts.

We summarize the evidence presented at trial. Rebecca Velma, the prosecutrix, was a 37 year old woman who had been a widow for 10 years. She was the mother of a 6 year old child who she supported by working in a beauty shop. She testified that on February 3, 1968, at about 8:30 P.M., she was accosted from the rear by two men as she was walking from her place of employment to Doris Whitaker's apartment where her son was staying. The defendant grabbed her from the left and put a knife against her side. The other man twisted her right arm

and then demanded her wallet. She handed over her wallet which contained $61.00. Her assailants then pulled her to the second floor of an apartment building located in the 1400 block of West Monroe Street. There in an attempt to escape she dashed into another apartment and sought aid from an old man. She screamed, "Please, mister, please help me, these men are going to kill me." The old man attempted to help her close the door on her assailants, but the defendant and the other man pushed the door open and dragged her out of the apartment. The two then brought her to another apartment on the second floor where they tore off her clothes. The defendant took $20.00 which she had concealed in her bra, and the unidentified second man raped her. The other man left when the defendant began to argue with him about money. The defendant then raped her and subjected her to a deviate sexual assault. After he was finished, he told her that he was going to get someone else to have sex with her, and he left. While the defendant was gone, she attempted unsuccessfully to escape through a barred window. When she heard footsteps, she threw her lipstick and rent receipt under the bed. The defendant returned, shouted at her, and ordered her to leave. "Bitch, get up and get out of here. My wife will be home in a few minutes. Who in Hell brought you in here? Get out of my room." She was then thrown out of the apartment. Barefoot and with her clothing in disarray she ran to Doris Whitaker's apartment, and told the Whitakers that she had been robbed and raped. The Whitakers did not have a telephone so she went to the home of Lillian Brimmage to call the police. The police came and she explained that she had been raped and robbed on the 1400 block of West Monroe Street. She then walked with the policemen along West Monroe Street. She saw the defendant standing on the steps of a building and identified him to the police. After that she went to the defendant's apartment with the police and recovered her lipstick which was under the bed.

Sylvester Johnson, a Chicago police, testified that he interviewed Rebecca Velma on the night of February 3, 1968. She told him that she had been raped and robbed, and she described her assailants. She did not know the exact address of the building into which she had been dragged, but she said she could identify the building if she saw it again. He and his partner accompanied her to the 1400 block of Monroe Street. After she had looked at two buildings, she identified as one of her assailants the defendant who was standing on a porch with about five others. Officer Johnson told the defendant that the prosecutrix had accused him of raping and robbing her. The defendant stated that he had never seen Rebecca Velma before. Officer Johnson then told the defendant that the prosecutrix said that she had left some of her be-

longings in the apartment. The defendant invited him to search his apartment. They went to the apartment and Rebecca Velma found her lipstick at the foot of the bed. In addition a lady's black shoe was found in the closet. He searched the defendant and found a pocket knife. He additionally testified that Rebecca Velma appeared frightened and that her dress was torn when he first saw her.

Doris Whitaker testified that Rebecca Velma arrived at her apartment at about 9:00 P.M. on February 3, 1968. She observed that Miss Velma had no shoes on her feet, that her garter belt and stockings were hanging halfway out of her pocketbook, and that her dress was all the way unzipped. Miss Velma said that she had been raped and robbed.

The defendant, James Taylor, testified on his own behalf and stated that on February 3, 1968, he was 24 years old and resided on the second floor of an apartment building located at 1430 West Monroe Street. Prior to that time he said he had seen the prosecutrix at various taverns and at the beauty shop. On February 3, 1968, he met the prosecutrix who was with a man named Shoe. He was told that Shoe and the prosecutrix were going to the Bedford Hotel to rent a room for $3.50, and he offered to let them use his room for $2.00. He took them to his apartment and while he was unlocking his door, the prosecutrix entered an old man's apartment. Edward Boyd, the old man, shouted at her and told her to leave the apartment. He, the defendant, went to the door of Boyd's apartment and told the old man that it was all right because he knew the prosecutrix. She then left Boyd's apartment and entered his apartment with Shoe. He left the two of them in his apartment and went out to a tavern. When he returned to the apartment he found the door open and the prosecutrix lying on the floor. He shook her and asked her to leave, but she said only that she wanted to sleep. He left the apartment to visit friends who lived on the first floor who were relatives of his former girl friend, Mary Jordan. After a while he went back to his apartment and again unsuccessfully attempted to waken the prosecutrix who was still lying on the floor and wearing only a bra. He went back to the first floor and told his friends about the prosecutrix. Since they did not believe him, Leon Jordan and two other men went upstairs to his apartment. After verifying his statement, they all went back downstairs and continued playing cards. He played cards for a few minutes and then left to try to waken the complainant, but she was gone when he arrived at his apartment. He returned to the first floor and resumed his card game. When someone said the police were coming, he went out to the porch with the others. He was then arrested, and his room and person were searched. At the police station he volunteered to take a sperm test, but the test was never given. He further testified that prior

to February 3, 1968, Mary Jordan had lived in his apartment and that she had left some of her clothing and cosmetics there.

Airry Jordan, Mary Jordan's brother, testified that he knew the defendant only by the name of James, but that he had known him for over a year and had often shot pool with him. At about 8:30 P.M. on the night the defendant was arrested, he arrived at his brother-in-law's apartment at 1430 West Monroe Street. The defendant entered and joined in a game of cards. After a few moments the defendant left and on his return said that there was a woman in his room. He and the other men went upstairs and after seeing the woman naked on the floor, they went back downstairs and continued their game. Subsequently, the defendant left the apartment and returned. He told them that the lady had gone. Someone noticed police cars out in the street, and they went outside to the porch. He heard a lady shout, "There he is," and saw the defendant being arrested.

Leon Jordan testified that he arrived with his sister, Mary Jordan, at Alvin Patton's apartment at about 9:00 P.M. The defendant joined the group at about 9:30. He overheard the defendant telling Alvin Patton that there was a woman in his room. The defendant left the apartment, and he heard the defendant shout something like, "I don't want you here." Afterwards he went with the others to look at the defendant's room, and he saw a lady lying on the floor. They returned to the first floor and resumed playing cards. He was on the porch with the defendant at the time of the arrest.

Mary Jordan testified that she went to Alvin Patton's apartment with her brother, Leon, on February 3, 1968. Up to that date she had been living with the defendant, but she had moved out that morning after an argument. The defendant came into Patton's apartment, stayed a few minutes, and then left. He returned five minutes later, and said that he was unable to get a lady out of his apartment. Her two brothers and her brother-in-law, left with the defendant to see the lady, but she did not go with them. They returned and resumed playing cards. She went out to the porch when the police came and she heard the prosecutrix identify the defendant.

In rebuttal, Edward Boyd, aged 62, testified that he lived on the second floor of an apartment building located at 1430 West Monroe Street. The defendant lived on the same floor of the building, but he did not often associate with the defendant, and he did not even know the defendant's name. He saw Rebecca Velma for the first time on February 3, 1968, when she cried for help and ran through his apartment. "She said, please open the door, so she could get in, that she was afraid they were trying to kill her." She appeared frantic when she entered the apart-

ment. She dropped her sweater and he gave the sweater to the defendant.

The defendant first contends that he was not proved guilty beyond a reasonable doubt. In support of this contention he argues (1) that the testimony of the prosecutrix was improbable and contrary to human experience, (2) that the prosecutrix was impeached and discredited on cross-examination, (3) that the defense witnesses were more credible than the prosecutrix, (4) that the prosecutrix's testimony was contradicted by the State's rebuttal witness, Edward Boyd, and (5) that the prosecutrix's testimony was substantially uncorroborated. The main thrust of these arguments is that the jury improperly evaluated the credibility of the witnesses.

■■■ A reviewing court will not set aside a jury verdict unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory, as to cause a reasonable doubt as to the guilt of the accused. (*People v. Sumner*, 43 Ill.2d 228, 252 N.E.2d 534.) The testimony of a single witness, if it is positive, and the witness credible, is sufficient to convict even though the testimony is contradicted by the accused. *People v. Hampton*, 44 Ill.2d 41, 253 N.E.2d 385.

In the case at bar the defendant was convicted of armed robbery. The prosecutrix testified that the defendant whom she had never seen before, robbed her at knife point. She immediately called the police and complained that she had been robbed and raped. She gave the police a description of her assailants. She accompanied the police in search of the building into which she was taken, and upon seeing the defendant she positively identified him as one of her assailants. Edward Boyd corroborated the fact that the prosecutrix was frightened and frantic before she entered the defendant's room. Doris Whitaker corroborated the fact that the prosecutrix immediately reported the incident.

■■■ During cross-examination, the prosecutrix was impeached by prior inconsistent statements concerning the time at which the incident occurred and concerning the existence of knife wounds. These discrepancies, however, were not such as to make her testimony unworthy of belief. The defendant was also impeached. He testified that he had seen the prosecutrix at various times prior to February 3, 1968, and that the prosecutrix had come to his room voluntarily; but on the night on which he was arrested, he first claimed that he had never seen her before. There were discrepancies in the testimony of all the witnesses, however, such discrepancies are not unusual in testimony concerning crimes of the nature before us. Upon a review of the entire record, we are satisfied that there was sufficient evidence to support a verdict of guilty.

It is next contended that the jury returned inconsistent verdicts. The

defendant was charged with rape, deviate sexual assault, and armed robbery, but he was convicted only of armed robbery. Since the prosecutrix was the only eye witness to the commission of the three crimes, the defendant argues that "[t]o the extent that the evidence left a reasonable doubt of the defendant's guilt of the sex offenses, it necessarily left a reasonable doubt of his guilt of robbery." We do not agree. The defendant was charged with three separate and distinct crimes, and in order to convict him of all three crimes, the State had to prove the commission of three separate and distinct acts. While the events which lead to the charges being placed against the defendant occurred during a brief span of time, they, nevertheless, were committed at different times and in different places. The prosecutrix testified that she was robbed on the street and then dragged into a building where she was robbed again and subjected to sexual assaults. The defendant denied the commission of any of the crimes and testified that the prosecutrix came voluntarily to his room, that he left her in the room with a man named Shoe, and that he subsequently found the prosecutrix lying on the floor in a stupor. The defendant's denial, however, was not the only evidence introduced which would tend to raise a doubt that the defendant had committed the sexual offenses. The jury was informed that the prosecutrix had been given a sperm test which had proved negative. On these facts the jury could consistently find that the defendant committed armed robbery while at the same time entertain a reasonable doubt that the defendant committed the sexual offenses.

The same argument as is raised here was raised and rejected in *People v. Garnett*, 113 Ill.App.2d 159, 251 N.E.2d 761. There Garnett was charged with murder and armed robbery. The defendant interposed an alibi defense. The only eye witnesses were two accomplice witnesses who testified that Garnett committed both the murder and attempted armed robbery. The jury found Garnett not guilty of murder, but guilty of attempted armed robbery. The Appellate Court affirmed the conviction and held that the jury based on the testimony could have believed beyond a reasonable doubt that Garnett participated in the armed robbery attempt while at the same time having reservations about his actually killing the deceased.

The defendant relies upon *People v. Griffin*, 88 Ill.App.2d 28, 232 N.E.2d 216 and *People v. Ethridge*, 131 Ill.App.2d 351. In *Griffin*, two defendants were charged with robbery. The same evidence was offered by the State against both, and the record on appeal did not indicate that one defendant had submitted more evidence in defense than the other. The trial court sitting without a jury found one defendant guilty and the other not guilty. The Appellate Court reversed the conviction of the

one found guilty since there was no plausible reconstruction of the State's case which would support finding one defendant guilty and the other not guilty. Likewise, in *Ethridge* two defendants were charged and tried for burglary and only one of the defendants was convicted. Two police officers testified that they saw both defendants carrying goods out of a dry goods shop at the same time, and a third officer testified that he saw the defendant who was acquitted leaving the building. Both defendants denied entry onto the premises. The Appellate Court reversed the conviction since the acquittal of the defendant against whom the stronger case was made raised a reasonable doubt of the other's guilt.

■■ The case at bar is distinguishable from *Griffin* and *Ethridge*. Here the prosecutrix testified to the commission of three distinct crimes which occurred at different times and different places. In both *Griffin* and *Ethridge* the eye witnesses testified that they observed the co-defendants committing the same crime at the same time, and in the same place. In addition, here the State's case on the sexual offenses was much weaker than it was on the armed robbery charge because of the existence of the sperm test which proved to be negative. In both *Griffin* and *Ethridge* the evidence against each co-defendant was essentially identical.

■■ The defendant complains that the trial judge improperly restricted the cross-examination of the prosecutrix when she testified in rebuttal. The defendant, while testifying in his own behalf, put into question the prosecutrix's reputation; and the prosecutrix was recalled to rebut the inferences raised by the defendant. The defense is entitled to reasonable cross-examination for the purpose of impeaching or discrediting the testimony of a witness. The extent of cross-examination, however, with respect to an appropriate subject of inquiry rests in the sound discretion of the trial judge. It is only in the case of an abuse of discretion resulting in manifest prejudice that a reviewing court will interfere. (*People v. Nugara*, 39 Ill.2d 482, 236 N.E.2d 693.) We have examined the questions propounded and we are not of the opinion that the trial judge abused his discretion in limiting the cross-examination of the rebuttal witness.

■■ It is further contended that the trial judge erred in refusing to give Defense Instruction No. 19 which reads:

"The court instructs the jury that it is the duty of the jury to consider the defendant's case as if he were a white man, for the law is the same as to both white and colored men, there being no distinction in principles in respect to color."

The trial judge, however, did give Defense Instruction No. 8 which reads as relevant here:

"Preliminary to your being accepted and sworn to act as jurors in this

case, you were examined by the court, the prosecution, and the defense as to your competency and qualifications to act as jurors in this case * * * . Your answers showed you were competent and qualified to act as jurors * * * . The answers you then made to questions in regard to your competency, qualifications, fairness, lack of prejudice, and freedom from passion and sympathy are as binding on you now as they were then, and should so remain until you are finally discharged from further consideration of the case."

Defense Instruction No. 8 adequately and fairly informed the members of the jury that it was their duty to decide the case without prejudice. Both the prosecutrix and the defendant were Negroes, and, as pointed out in a colloquy between the Court and the Assistant State's Attorney, there were several Negroes on the jury which only found the defendant guilty of one of the charges. We fail to see how, under these circumstances, the defendant was prejudiced by the failure to give Defense Instruction No. 19.

■■ Prior to trial, the defendant made a motion to suppress "any and all confessions, statements, or admissions of defendant made at the time of or after his arrest," and elicited in violation of *Miranda v. Arizona*, 384 U.S. 436. The motion was subsequently withdrawn. The prosecutor, just before the trial, informed the Court of the existence and withdrawal of the motion, and he stated that he would not use any extra judicial statements of the defendant. Officer Sylvester Johnson testified that after the prosecutrix pointed out the defendant, he Johnson, told the defendant that the prosecutrix had accused him of raping and robbing her. The defendant replied that he had never seen the prosecutrix before. He also stated that there was nothing in his room other than his own clothing. Objections were made to the admission of these statements. The Court admitted them and ruled that the statements were spontaneously made prior to arrest when the defendant was confronted by his accuser. The Court in making its ruling was aware of the withdrawal of the motion to suppress and the agreement of the prosecutor. Prior to trial, the Court conducted an extended evidentiary hearing on a motion to suppress physical evidence. As a part of that hearing, the Court determined the point in time that the defendant was taken into custody and arrested. Since the statements were made voluntarily without compulsion, and prior to the defendant's being taken into custody, they were properly admitted. As stated in *Miranda*, 384 U.S. at 478, "Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence."

The defendant relies upon *People v. Mwathery*, 103 Ill.App.2d 114, 243 N.E.2d 429. There the defense withdrew a motion to suppress a

written and signed statement of one of two codefendants upon the representation by the prosecutor that the statement would be used for no purpose whatever. Nevertheless, the prosecutor elicited the fact that an accomplice witness, who was not a defendant, had given a confession because he had been shown the written and signed statement which the prosecutor had agreed not to use. The Appellate Court held that the reference to the statement violated the agreement and the rules laid down in *Miranda*. In the present case, in contrast, the statements introduced were not made while the defendant was in custody or under arrest and they were not elicited in violation of *Miranda*.

■■ The defendant next asserts that he was prejudiced by the prosecutor's repeated statements that medical testimony was unimportant. He also argues that the Court erred when it instructed the jury that the State was not required to produce medical testimony to sustain a charge of rape when sufficient other corroboration of the complaining witness is presented as to forcible intercourse. Even assuming *arguendo* that error was committed, the defendant was not adversely affected since he was found not guilty of the sexual offenses.

■■ It is next contended that the prosecutor attempted to rehabilitate the prosecutrix by improper methods. The defendant argues first that the prosecutor used leading questions almost exclusively in eliciting rebuttal testimony from the prosecutrix. The propriety of asking leading questions is a matter which rests in the sound discretion of the trial court. A reviewing court will not reverse a conviction because the trial court permitted the use of leading questions unless it appears both that the trial court abused its discretion and that such abuse resulted in substantial injury to the defendant. (*People v. Meritt*, 367 Ill. 521, 12 N.E.2d 7.) It is clear to us that the trial court did not abuse its discretion.

The defendant next argues that the prosecutor improperly attempted to introduce the police report and grand jury minutes into evidence in the presence of the jury. Prior to cross-examining the prosecutrix defense counsel received copies of these two documents and the transcript of the preliminary hearing. These documents were used extensively by him in a lengthy cross-examination in order to impeach the credibility of the prosecutrix. During redirect examination of the prosecutrix the prosecutor had the police report marked for identification, whereupon a discussion was had in chambers. The prosecutor sought to introduce the three documents into evidence. The Court ruled that they were inadmissible, but stated that the prosecutor could offer the documents into evidence in open court. Thereafter, in the presence of the jury, the prosecutor questioned the prosecutrix concerning her statement to the police, her testi-

mony before the grand jury, and her testimony at the preliminary hearing. He offered the police report and the grand jury minutes into evidence, but neither was admitted.

■■ The defense attempted to impeach the prosecutrix by pointing out that her testimony at trial was inconsistent with statements made to the police, to the grand jury, and at the preliminary hearing. It was proper for the prosecutor to bring out other portions of the impeaching statements in order to rehabilitate the witness. As stated in *People v. Hicks*, 28 Ill.2d 457 at 463, 192 N.E.2d 891 at 894 "* * * it is well settled that where a witness had been impeached by proof that he has made prior inconsistent statements, he may bring out all of the prior inconsistent statements to qualify and explain the inconsistency and rehabilitate the witness."

■■ We perceive no prejudicial error in permitting the prosecutor to offer the police report and grand jury minutes into evidence in the presence of the jury. The existence of these documents was first brought to the attention of the jury when the defense used these documents to impeach the prosecutrix. The Court did not receive them into evidence, and it instructed the jury to disregard any evidence which was not admitted.

■■ The defendant finally contends that the Court erred in permitting the State to display before the jury objects which were not received into evidence. We find no merit to this contention. The State had a black dress, a pair of shoes, a black suede shoe, and a wallet marked for identification. Several witnesses testified concerning these articles in an attempt to lay a foundation for their admission. After argument of counsel, in chambers, the objects were denied admission. The defendant argues, "But if they were not to be received in evidence, then they should not have been displayed before the jury." It is not error for the Court to permit the prosecution to submit an exhibit to a witness in the presence of the jury in a good faith attempt to lay a foundation for the exhibit's introduction, even though the exhibit is finally excluded. (*People v. Powlowski*, 311 Ill. 284, 142 N.E. 551.) The jury was instructed to disregard all evidence not admitted into evidence. Moreover, from our observation of the record, most of the exhibits were related to the sex offenses of which the defendant was found not guilty.

We have examined all the claimed errors and find none prejudicial to the rights of the defendant.

Judgment affirmed.

ADESKO, P. J., and DIERINGER, J., concur.