THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RAYMOND COOPER, Defendant-Appellant.

(No. 58689;

First District (4th Division)—June 25, 1975.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson and Patrick Gleason, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Edward J. Ozog, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ADESKO delivered the opinion of the court:

Following a jury trial in the Circuit Court of Cook County, the defendant, Raymond Cooper, was found guilty of murder, burglary, and robbery and was sentenced to serve concurrent terms of 14 to 18 years for murder, 2 to 4 years for burglary and 2 to 4 years for robbery.

On appeal the defendant's contentions are the following:

(1) The defendant did not knowingly and understandingly waive his *Miranda* rights, and, concomitantly, no weight should be given to the trial court's ruling on the motion to suppress;

(2) The trial judge erred by failing to give defendant's withdrawal instruction;

(3) Reversible error was committed when a confession instruction, rather than an admission instruction, was submitted to the jury; and

(4) The robbery and burglary arose from the same act.

On August 16, 1971, a hearing was held on defendant's motion to suppress the following statement, made on October 6, 1970, by Cooper before Chicago Police Investigators William Nolan and William Foster:

"Nolan: What is your name, age, address and date of birth?

Cooper: Raymond Cooper, I'm 17 and live at 4342 W. 21st Pl. May 19, 1953.

Nolan: What is your business or occupation and with whom do you reside?

Cooper: I am unemployed at this time and I live with my parents.

Nolan: Do you know where you are at this time and for what reason?

Cooper: I'm at the Maxwell St. Police Station and I'm here to tell you what I know about the lady that was found dead downstairs from where Reginald Stenson lives.

Nolan: You mean Reginald Stenson who lives at 4258 W. 21st Pl. on the second floor and who is presently charged with the murder of this lady who is identified as Leola Thompson?

Cooper: Yes that is the same one.

Nolan: Now Raymond before we go any further you have been told that you also face possible charges in this murder is that right?

Cooper: Yes that is right?

Nolan: Knowing this and also the fact that you have been warned of your constitutional rights to remain silent, that you have a right to have an attorney before any statement you give, that anything you say can and will be used against you at a later date in a court of law and also that if you cannot afford to hire an

attorney the State will provide one for you and that attorney can be present before you answer any questions or give any statement, do you still wish to give this statement after being so informed and understanding all of these rights? /initialed/

Cooper: Yes I do.

Nolan: Will you initial the last question I asked you so it will indicate you have read and understood and waived your rights under the constitutional laws?

Cooper: Yes I will.

Nolan: Now will you go ahead and in your own words tell just what you know about the killing of Leola Thompson?

Cooper: On Sunday night, the 27th of Sept. 1970 me and Reginald had been playing cards in my house and about 1 or 2 in the morning we left and that was when we ran into Walter Dixon on the street. Walter asked Reggie and me if we wanted to make any cash money and we said yea man how can we do it? Then Walter said we can rip off that broad that owns the taverns that lives downstairs from Reggie. We were a little afraid to do it but Walter kind of acted like the boss because he was older and he said that there wouldn't be any trouble. Then Walter, Reggie and me went into Reggie's basement from the back door. I don't know how the door was opened but I know that's how we all got in and then we went up to the lady's apartment through the basement door. [End of page one] /initialed/

Nolan: Please continue on with your statement—

Cooper: Well like I said we went up through the basement stairs and hid in the kitchen behind the door until she came home. Then the lady came in through her kitchen door and I grabbed her from behind and Reggie also grabbed her and Walter wrapped a towel around her face and head to keep her from screaming. The lady then slipped and fell on the floor and Walter said to tie her hands behind her back. Reggie and I were holding her down and she was laying on her side and Walter tied her hands behind her back. After she was tied up I asked Walter what he was going to do and he said now we will see if the broad has got some money. Then I got scared and I told Reggie and Walter that I was leaving and I went back down the same way we came in. I was going out when I called for Reggie to come and he said alright and then we both left out. Walter was still in the house with the lady when we left.

Nolan: Where did you and Reggie go after you left the woman's house?

Cooper: We went back to my house and then a short time later

Reggie left and said he was going home because he had to go to work in the morning.

Nolan: When was the next time you saw Walter Dixon?

Cooper: The next morning I saw him on the block where we live and he said "Hey man Reggie killed that broad" and I told him not to say that and then we saw Reggie and Walter said to him, "Man you must have killed that broad" and Reggie got mad and told Walter that if anyone killed her you did because Ray and I left you alone with the broad after we left.

Nolan: When you left you saw the lady on the floor tied up in the kitchen is that right?

Cooper: Yes, that is right.

Nolan: Do you know where we can locate Walter Dixon at this time?

Cooper: Well if he is not at home he is somewhere on the street because he is always on the street.

Nolan: Is there anything else you can add to this statement?

Cooper: No except that if there was any money stolen from that lady I didn't get any of it and Walter must have taken it all.

Nolan: If you are asked these same questions at a later date will your answers to these questions be substantially the same as you have now stated?

Cooper: Yes, because I'm telling the truth.

Nolan: After reading this statement consisting of two type-written pages and finding it to be as you have stated will you sign it?

Cooper: Yes I will."

At the hearing on the motion to suppress, Investigator Nolan testified that he and his partner, William Foster, on October 6, 1970, brought Raymond Cooper to a police station for questioning. Approximately 10 minutes after arriving at the station, Cooper was advised orally of his constitutional rights. He was asked if he understood those rights. He responded that he did. Twenty to thirty minutes later, Investigator Nolan, using a typewriter, took the statement quoted above from the defendant. During the taking of the statement, Investigator Nolan orally readvised defendant of his rights. Defendant responded that he understood those rights and still wished to give the statement. The warnings given to the defendant and his response to them were typed by Investigator Nolan and read and initialed by the defendant. The statement was completed in approximately 1 hour. The defendant then read the entire statement, initialed the first page and signed the second page. Investigator William

Foster testified on behalf of the State and corroborated Investigator Nolan's testimony.

The defendant called one psychiatrist and two psychologists in support of his motion to suppress the statement. Dr. Robert Reifman, a psychiatrist, testified that he interviewed the defendant on three separate occasions, each session lasting one-half hour. Dr. Reifman described the defendant as withdrawn and slow, with below average reading and thinking ability. Dr. Reifman doubted that an individual of similar intelligence and background would be able to understand his constitutional rights as found in the typed statement. On examination by the trial judge, Dr. Reifman testified that a police officer could communicate with the defendant if the officer was willing to take the time. Dr. Arthur Hartman, a clinical psychologist, testified that defendant was given a full battery of psychological, intelligence and personality tests. Defendant scored 71 on an I.Q. test and between a second and third grade level on a reading test. Dr. Hartman testified that although the defendant probably could not read or understand, unaided, certain words in the statement typed by Investigator Nolan, defendant "could go through and read this [statement] himself and understand himself as a whole." Dr. Hartman further testified that the statement could have been given orally by the defendant since it was within defendant's level of verbal use. Defendant responded "quickly and directly" when interviewed by Dr. Hartman. Mr. Jeff Blezien, a psychologist with the Chicago Board of Education, examined defendant in 1969 for placement in the Chicago public schools. Defendant was found to be educable mentally handicapped. At that time defendant's reading level was third grade, his mental ability was 10 years 8 months, and his chronological age was 15.8. His overall ability was on the fifth grade level. In 1971, Mr. Blezien reexamined defendant and found that defendant had regressed slightly, possibly due to the custodial environment of Cook County Jail.

The defendant testified in his own behalf. He denied making any statement to Investigator Nolan. Defendant admitted initialing and signing the statement because he was scared. He denied reading the statement or that it had been read to him. On direct examination, defendant testified that Investigators Nolan and Foster did not ask him if he wanted an attorney. Rather, when he asked for an attorney, Investigators Nolan and Foster told him not to worry about it. Also, on direct, after denying that the police told him that he was being charged with murder, the defendant responded to defense counsel's questions as follows:

"Q. Did they tell you—strike that—when did you ask for a lawyer?

A. After when the police told me that if you could not afford an attorney that one would be furnished to you.

Q. Did they tell you that anything that you said to them would be used against you in a Court of Law?

A. I didn't hear them."

The court entertained arguments with regard to the motion to suppress. The State made a brief argument asking the court to deny the motion. The court responded "denied," The defense then made a lengthy argument in support of its motion. After both arguments were heard, the trial judge denied the motion and gave his reasons for so ruling.

Defendant contends that the trial court erred in denying his motion to suppress the statement he signed. It is asserted that he was intellectually incapable of understanding the *Miranda* warnings in the form given to him; therefore, any waiver made by him at that time was not voluntary. Additionally defendant argues that no weight should be given to the trial court's ruling on the motion, because the court both misconstrued the issue posed by the motion and prematurely denied it.

■■■ The trial court's ruling, after a hearing on a motion to suppress, will not be disturbed unless it is against the manifest weight of the evidence. (*People v. Higgins* (1972), 50 Ill.2d 221, 278 N.E.2d 68; *People v. Baker* (1973), 9 Ill.App.3d 654, 292 N.E.2d 760.) When the issue is raised on a motion to suppress, the State has the burden to show by a mere preponderance of the evidence that a statement was voluntary. (*Lego v. Twomey* (1972), 404 U.S. 477, 30 L.Ed.2d 618, 92 S.Ct. 619; *People v. Baker* (1973), 9 Ill.App.3d 654, 292 N.E.2d 760.) A suspect may waive his constitutional rights provided he does so voluntarily, knowingly and intelligently. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602.) The determination of whether there has been a knowing and intelligent waiver in a case depends upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. (*Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L.Ed. 1461, 58 S.Ct. 1019.) A statement elicited from a 17-year-old boy of subnormal intelligence is not necessarily inadmissible (*People v. Hester* (1968), 39 Ill.2d 489, 237 N.E.2d 466), but in the absence of a coercive atmosphere, it does not ipso facto make the statement involuntary but it is a factor to be considered in the totality of the circumstances under which a constitutional right is waived or a statement made. *People v. Turner* (1973), 56 Ill.2d 201, 306 N.E.2d 27.

The police are not required to conduct a mental examination of the accused with a view to ascertaining his ability to comprehend the rights involved as a prerequisite to accepting a waiver. (*People v. Baker* (1973), 9 Ill.App.3d 654, 292 N.E.2d 760.) However, when a child is involved,

a trial court must use special care in ascertaining if a confession was given voluntarily. *People v. Simmons* (1975), 60 Ill.2d 173.

■■ This court believes that under the rules set forth above and in light of the facts presented in this case, the trial court did not err in denying defendant's motion to suppress. Dr. Reifman testified that a police officer could communicate with and be understood by the defendant "if the officer was willing to take the time." Investigator Nolan testified that the question and answer period during which the two-page statement was typed took approximately one hour to complete. Dr. Hartman testified that, on the basis of the results of a full battery of tests, the defendant could read and understand the statement as a whole. The third expert witness for the defense was Jeff Blezien, a school psychologist who administered a series of tests to the defendant in 1971. On redirect examination, the following was stated:

> "Q. Mr. Nettleton: Do you have an opinion as to whether or not Raymond Cooper took a dive?
>
> \* \* \*
>
> A. Mr. Blezien: Yes, he did."

Finally, by taking the witness stand, the defendant afforded the trier of fact an opportunity to evaluate defendant's ability to communicate and understand. On direct examination the following was stated:

> "Q. Mr. Nettleton: When did you ask for a lawyer?
>
> A. Defendant: After when the police told me that if you could not afford an attorney, that one would be furnished to you."

Further discussion of the record at this point is unnecessary. We believe that the trial court's ruling was clearly not against the manifest weight of the evidence. We give full value to the trial court's carefully considered ruling on the motion to suppress. Contrary to defendant's assertions, we have no doubt that the trial court correctly perceived the issue at hand. The record clearly shows that both during the course of the testimony and in his statement explaining the denial of the motion, the trial judge understood the issue to be whether defendant knowingly and intelligently waived his *Miranda* rights. Additionally, full argument was allowed to both sides on the motion before the trial judge finally denied the motion.

■■ Defendant's next contention on review is that the trial court erred by failing to give defendant's tendered withdrawal instruction. Defendant argues that his leaving the victim's apartment before the act which caused her death was some evidence of defendant's withdrawal, thereby requiring the jury to be instructed on this theory. Section 5—2(c) (3) of the Criminal Code states that a person is not legally accountable for the conduct of another when:

"Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission * * *." (Ill. Rev. Stat. 1969, ch. 38, par. 5—2(c)(3).)

This court does not believe that the trial court erred by failing to instruct the jury with an instruction derived from section 5—2(c)(3). Although there was evidence presented that defendant had terminated his criminal conduct before the murder was committed by leaving the victim's apartment while she was alive, there was no evidence adduced going to the second element required here for a successful withdrawal; that the defendant had deprived his prior efforts of effectiveness. Defendant stated that he "grabbed her from behind" and held her while a towel was wrapped around her face. "The lady then slipped and fell on the floor * * *. Reggie and I were holding her down * * * and Walter tied her hands behind her back." There was no evidence introduced to show that defendant made any effort to neutralize the effect of his conduct. Therefore, because there was no evidence going to the second element of withdrawal, the trial judge correctly refused to give defendant's withdrawal instruction.

■■ Defendant next contends that reversible error was committed when a confession instruction, rather than an admission instruction was submitted to the jury. Supreme Court Rule 451(c) states: "Instructions in criminal cases shall be tendered, settled, and given in accordance with section 67 of the Civil Practice Act * * *." (Ill. Rev. Stat. 1969, ch. 110A, par. 451(c).) Section 67 (3) states in part: "No party may raise on appeal the failure to give an instruction unless he shall have tendered it." (Ill. Rev. Stat. 1969, ch. 110, par. 67(3).) Because an admission instruction was never submitted to the trial court, defendant cannot complain here on review that the instruction was not given. The confession instruction given to the jury read in part, "You have before you evidence that the defendant confessed that he committed the crime charged in the indictment." Defendant argues that the signed statement to the police was not a confession to the murder. He concedes, however, that the statement was a confession to the burglary charge. Because the confession instruction simply refers to "the crime" this court believes the instruction may be construed as applicable to the burglary charge. Defendant made no tender of any limiting instruction. Moreover, if the statement is concededly a confession to burglary, the defendant is legally accountable for murder under the felony murder rule. For these reasons, this court believes that no error was committed.

Defendant's final contention is that the judgment and sentence for burglary should be reversed because the robbery and burglary arose from the same act. We cannot agree. The robbery and burglary constituted two offenses which required separate physical acts and different elements of proof. The defendant entered into separate though related courses of conduct based on different motivations. Upon entering the victim's apartment, an indeterminate period of cool deliberation ensued before the victim arrived. Additionally, evidence was adduced which inferentially indicated that a theft of the apartment had taken place. For these reasons we believe the convictions and sentences imposed for burglary and robbery must both stand.

The judgments of the Circuit Court of Cook County are affirmed.

Affirmed.

DIERINGER, P. J., and BURMAN, J., concur.