THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WOODROW RICHARD, a/k/a Richard Woodrow, Defendant-Appellant.

First District (4th Division)    No. 79-861

Opinion filed October 30, 1980.—Rehearing denied December 18, 1980.

324

Emory Tate & Associates, of Chicago (Brundage & Welch, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Eisen-Stein, and Michael M. Lorge, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Woodrow Richard, was convicted of the murder of William Leben. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1.) Defendant was sentenced to a prison term of 50 to 100 years.

On appeal, defendant contends his conviction should be reversed because: (1) the identification testimony adduced at trial was neither positive nor credible; (2) he was substantially prejudiced by the trial court's refusal to allow questioning of the State's chief witness about her unlawful acts and her prior arrest for prostitution; (3) the trial court improperly refused his jury instruction concerning the defense of withdrawal from accountability (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)(3)); and (4) the prosecutor's closing argument was improper and prejudicial.

We affirm.

At trial, police officer Bruce McElrath testified that on October 2, 1976, at approximately 11:30 p.m., he was patrolling in the vicinity of Cermak Road and Karlov Avenue when an unidentified citizen informed him that a man was lying in the street. McElrath proceeded to that location and found an elderly, neatly dressed male, later identified as William Leben, lying in the eastbound lane of 4100 W. Cermak Road. The elderly man was dead.

McElrath explained that Cermak Road is divided by a parkway and that the man's body was discovered close to a bench in the parkway.

McElrath also noted that there is a bus stop sign nearby and that the area was "well lit" with "sulphur" streetlights which gave a "yellow cast." On cross-examination, McElrath stated he discovered Leben's body approximately five feet from the nearest streetlight. He also acknowledged that there were cars parked on the north and south sides of Cermak Road.

McElrath conducted a search of Leben's clothing and he recovered a wallet containing more than $70 in currency, and a "starter pistol" which only produces noise when fired. While conducting a search of the surrounding ground, McElrath found three spent cartridge shells.

Officer Theopsy Moore testified that when he arrived at the scene, several police units were present. He inventoried the items McElrath recovered from Leben's clothing and sent the three spent cartridge shells to the crime laboratory.

Sergeant Joseph Celovsky, a firearms expert, testified he performed tests on these cartridges and the two bullets removed from Leben's body. He determined that the three discarded cartridges had been fired from the same .25-caliber automatic gun and the two bullets taken from Leben's body had been fired from the same .25-caliber automatic gun.

Eddie Harris, a Chicago Transit Authority bus driver, testified he was driving a westbound bus on October 2, 1976, at approximately 11 p.m. when an elderly, neatly dressed man boarded the bus. Harris stopped the bus at the corner of Cermak Road and Karlov Avenue at approximately 11:15 p.m. and the elderly man left the bus. Harris remembered the area because it was late and the elderly male, "a white," was entering a "bad, kind of rough area." Harris returned to this area approximately 15 minutes later and saw three men running east on Cermak Road. He did not see the elderly man. Harris was not able to identify defendant as one of the three men he saw running.

The only eyewitness to the shooting, Gladys Nash, stated that on October 2, 1976, at approximately 11 p.m., shortly after drinking one can of beer, she left her home and walked to a friend's apartment located at 4100 W. Cermak Road. On the way to her friend's, she stopped at a lounge for five minutes, but she did not have anything to drink. After she entered the vestibule of the building located at 4100 W. Cermak Road, two men suddenly approached her. Although she did not know their names, she had seen them around the neighborhood and recognized their faces. The vestibule was well lit. Defendant, who was standing approximately one foot from Nash, began to make sexual advances towards her. Nash made an in-court identification of the defendant as the man who accosted her in the vestibule.

Nash further testified that she screamed and the two men then left the vestibule. As they left, Nash noticed a third man waiting outside. Nash rang her friend's bell, but there was no answer. She went outside

and stood on the steps of the apartment building. From where she stood, she saw defendant and another man cross Cermak Road. Looking over five or six parked cars, she observed a "well dressed white man" later identified as Leben, sitting on a bench in the parkway on Cermak Road. Nash asserted she was standing approximately 50 feet from the park bench and she had a clear unobstructed view of the scene. Two streetlights, located near the park bench, illuminated the area.

Nash further testified that she observed defendant approach the man and begin to struggle with him. She also stated that defendant and his companion appeared to be going through the pockets of the man's clothing. Nash heard two or three shots fired and saw the man fall to the ground. Nash asserted she did not know at the time of the incident that what she heard were gun shots.

Defendant and his companion then ran in a westerly direction on Cermak Road. Nash observed an unidentified black object in defendant's hand as he ran. The elderly man staggered across the street. Nash then left the area and returned home.

On December 14, 1976, over two months after the incident, Nash identified defendant from a group of eight photographs as the person she observed on the night of October 2. On December 20, 1976, Nash identified the defendant from a lineup of five black men. Defendant's attorney was present during the lineup procedure. At trial, Nash again identified defendant, and she also identified pictures of Leben, the victim. Nash admitted she had been convicted of a misdemeanor theft in 1973 and that at the time of defendant's trial she was awaiting trial for another misdemeanor theft.

On cross-examination, Nash asserted that only two men approached Leben and that she did not see the third man after she first noticed him standing outside her friend's apartment. Nash also admitted she could not remember the type of clothing the defendant was wearing or whether he was wearing sunglasses. She further acknowledged that she did not actually see defendant's hands going into Leben's pocket.

Nash also admitted that at the trial of one of defendant's companions, she had not identified that person as one of the men who was with defendant on the night of the incident. She had identified that person, however, prior to that trial. She explained the inconsistency by stating that prior to that person's trial, she had received an anonymous threatening phone call, and the party calling warned her not to testify.

Investigator John Laskey testified that on October 3, 1976, he talked with people in the area where the incident occurred. On November 10, 1976, Laskey approached defendant and asked him to enter Laskey's car. As they drove to the police station, at approximately 11:30 a.m., Laskey advised defendant of his constitutional rights and defendant said he

understood them. Defendant told Laskey he knew nothing about the shooting of Leben.

About 15 minutes later, they arrived at Laskey's office. Laskey and his partner, Charles Dulny, talked with defendant in an interview room at 12:15 or 12:30 p.m. and defendant denied any knowledge of the shooting incident which resulted in Leben's death. At 2 or 2:30 p.m., they again interviewed defendant, who continued to deny any knowledge of the shooting. At 7 p.m., defendant told Laskey that on the night of the shooting at 9 p.m., he met two friends, James Survell and Charles Hill. Charles Hill showed defendant a black and white small caliber automatic gun. The three men began to walk back and forth on 21st Street, looking for a victim they could rob. They stopped at 4111 W. Cermak Road. Defendant said he then left to purchase a pack of cigarettes at a store about a block away from where his friends were standing. As defendant walked back, he saw his friends take hold of a white man standing at a bus stop. He heard some shots, started towards them, but he changed his mind and walked away in the opposite direction.

Laskey then testified to the procedures of the photographic and lineup identifications in which Nash participated. He also noted that there were streetlights on both sides of the parkway where the shooting occurred and another streetlight in the parkway, approximately 20 feet from the park bench.

Assistant State's Attorney Joseph Lacallo testified to the events surrounding an oral statement reduced to writing which defendant gave on November 11, 1976, at approximately 9 p.m. Lacallo advised defendant of his constitutional rights and defendant told him he understood these rights. Defendant told Lacallo that on the night of the incident at 11 p.m., defendant met with Charles Hill and a man named James. They went to the house of another friend, called "Tag," and sat on the porch. Defendant asserted the three men discussed robbing someone because they wanted to make some money.

Hill then showed defendant a black .25-caliber automatic gun with a white handle. Defendant held the gun two to three minutes before he went to purchase cigarettes. As he returned, he saw Hill take hold of a white man. Defendant also noticed that James was holding a gun. Defendant then turned around and, as he ran into a nearby gangway, he heard one shot.

Lacallo further testified that he called Ed Strabrawa, a court reporter, who arrived at midnight and transcribed defendant's statement. Defendant, however, refused to sign the statement.

On cross-examination, Lacallo stated that he had informed defendant that he had interviewed several other young men. Lacallo could not remember if he told defendant that anyone had made a statement against

defendant. Between the time Lacallo talked with defendant and Strabrawa transcribed defendant's statement, Lacallo interviewed Maurice Curtis. Lacallo admitted he had informed defendant that Maurice Curtis had implicated defendant in the murder of Leben.

Strabrawa, the certified shorthand reporter, testified he transcribed a statement made by the defendant on November 11, 1976, but the defendant refused to sign the transcribed document. The statement was then introduced into evidence and read to the jury. The defendant, according to the statement, recounted the story and, when asked about the plans to commit a robbery, defendant said:

> "Well, James brought it up to me that if I wanted to make some money that night he said he might stick up somebody or go steal something or something like that. First, I told them no. Then I still walked with them. Then I was intending to do it myself. Then something changed my mind, and I went to get some cigarettes."

The last witness for the State, Dr. Robert Stein, testified that while performing an autopsy on Leben's body, he discovered four bullet wounds, three entrance wounds on the anterior chest wall and one exit wound on the back. One bullet perforated the lungs and exited through the back. The other two bullets perforated the lungs, the diaphragm, the liver, and the aorta, the major blood vessel of the body. He removed two bullets from Leben's body. The chest bullet wounds caused Leben's death.

The State rested its case; the defense did not present any witnesses. After deliberation, the jury found defendant guilty of murder. The trial court sentenced him to a prison term of 50 to 100 years. This appeal followed.

OPINION

I

Defendant first contends that Nash's identification is neither credible nor positive and, therefore, defendant asserts he was not proved guilty beyond a reasonable doubt. We disagree.

It is well established that where the identity of the accused is at issue, the testimony of a single witness is sufficient to convict, even if the identification testimony is contradicted by the accused, provided that the witness is credible and the accused is viewed under circumstances which would permit a positive identification to be made. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.) The identification does not have to have been made under perfect conditions or for a long period of time. *People v. Porter* (1975), 29 Ill. App. 3d 456, 330 N.E.2d 599.

■■ Rather, the important factor is whether the witness had an adequate opportunity to view the alleged offender at the time of the occurrence. (*People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235.) Additional factors to be considered in evaluating identification evidence include: (1) the witness' degree of attention; (2) the accuracy of the witness' prior description of the criminal; (3) the level of certainty demonstrated by the witness at the confrontation; and (4) the length of time between the crime and the confrontation. *People v. Bell* (1975), 29 Ill. App. 3d 1032, 331 N.E.2d 258; *cf. People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.

In the instant case, Nash viewed defendant under circumstances which permitted her, at a later time, to make a positive identification of defendant. Nash testified, as did Officer McElrath, that there were two lighted streetlights on Cermak Road and another lighted streetlight near the park bench where the incident occurred. Nash also observed defendant's face from a distance of one foot only a few minutes prior to witnessing the shooting incident. From the second step of a porch, and a distance of 50 feet, Nash watched defendant walk across the street and struggle with the victim. She heard loud noises, observed the victim fall, and she saw defendant and his companions running away from the parkway.

Further, Nash's detailed description of events indicates she was closely attentive to the enactment of the crime. The fact that defendant had been assaulting Nash just minutes before the incident supports the inference that Nash was fearfully watching defendant and "viewed [the scene] with the close attention accorded unusual occurrences." (*People v. McTush* (1980), 81 2d 513, 522, 410 N.E.2d 861, 866.) Nash also consistently and positively identified defendant: first from a group of eight photographs; second from a lineup of five men; and finally at trial. In addition, she testified that prior to the incident she had seen defendant in the neighborhood several times. This strengthens the reliability of her identification. See *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.

■■ Defendant argues that because Nash did not actually discover the victim had been shot until two months after the incident, her identification is unreliable. Similarly, he argues, that the identification testimony is uncertain because of the two-month delay between the shooting incident and Nash's first confrontation with defendant. In our view, this delay is insufficient to render Nash's identification testimony unreliable. See *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.

■■ Similarly, Nash's failure to identify one of defendant's companions at the companion's trial does not render incredible Nash's identification of defendant. Nash explained she had received a threatening telephone call and she was afraid to make the other identification. We believe this is

plausible, especially since Nash had been assaulted by defendant while his companion was present. (See *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.) It was the function of the jury to weigh these factors in evaluating Nash's testimony, and we cannot say that their determination was erroneous.

Defendant also argues that since Nash testified defendant ran from the scene in a westerly direction and Harris testified defendant ran in an easterly direction, Nash's testimony is inconsistent and therefore unreliable. In our view, the discrepancy is not of sufficient magnitude to thoroughly discredit Nash's testimony, but rather was a factor to be weighed by the jury in assessing the witness' credibility. Variations in testimony are not uncommon and minor discrepancies affect the weight to be accorded to the witness' testimony. *People v. Nicholson* (1965), 55 Ill. App. 2d 361, 204 N.E.2d 482.

■■ We conclude, therefore, that the jury was entitled to believe Nash's identification testimony[1] and that it is sufficient to support the conviction.

## II

Defendant next contends that he was substantially prejudiced by the trial court's refusal to allow defense counsel to cross-examine Nash about her occupation as a prostitute. Defendant argues this line of questioning was relevant to show Nash's lack of credibility and her motive to falsely testify.

Although the defense is entitled to reasonably broad cross-examination for purposes of impeachment or discrediting the testimony of a witness, the extent of cross-examination with respect to an appropriate subject of inquiry rests in the sound discretion of the trial judge, and it is only where an abuse of discretion occurs, resulting in manifest prejudice, that a court of review will reverse. (*People v. Taylor* (1971), 132 Ill. App. 2d 473, 270 N.E.2d 628; see also *People v. Rolon* (1979), 71 Ill. App. 3d 746, 390 N.E.2d 107.) While the partiality of a witness "is 'always relevant as discrediting the witness and affecting the weight of his testimony.' [Citation.]" (*Davis v. Alaska* (1974), 415 U.S. 308, 316, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110), defendant must at least present direct evidence,

---

[1] We also note that the jury was instructed on the theory of accountability (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)) and we believe the evidence was sufficient to convict defendant upon this theory. In defendant's statement, he admitted he planned to rob a victim. Portions of the statement were corroborated by the testimony of Nash and Harris. Although defendant claimed he was not present during the actual shooting, he nevertheless is responsible for acts done in furtherance of a common criminal plan and, where death results, each person involved in the plan is responsible for the murder whether or not he is present at the scene of the occurrence. *People v. Brown* (1962), 26 Ill. 2d 308, 186 N.E.2d 321.

rather than uncertain or remote evidence, that such bias exists. See *People v. Nowak* (1979), 76 Ill. App. 3d 472, 395 N.E.2d 28; *People v. Yuknis* (1979), 79 Ill. App. 3d 243, 398 N.E.2d 258.

Here, defendant did not present any direct evidence to the court that Nash had a motive to falsely testify. Defendant argues that there is evidence in the record which may lead to the inference that Nash was under police influence at the time she identified defendant. This evidence consists of Nash's voir dire testimony that she had engaged in prostitution but had not recently been arrested, and her direct-examination testimony that she first identified defendant after she was notified by friends, who were police officers, that the police wanted to question her about the murder. The fact that Nash was in custody awaiting trial on a charge of theft, however, was brought out on cross-examination, and defendant argues Nash was therefore subjected to police pressure and motivated to testify falsely against defendant.

The trial judge noted that Nash had not been arrested for prostitution since 1975 and concluded that defendant had failed to establish a pattern of arrests of Nash before defendant's case and a lack of the witness' arrests after the case. We agree with the trial court's decision not to "get into a trial on the speculation that this lady may * * * be subject to some vague police pressure without regard to whether or not, in fact she is." The facts cited by defendant to buttress his argument of police pressure are merely speculative; even defendant admits that these facts "may lead to the inference" of police pressure. As in *People v. Hanks* (1974), 17 Ill. App. 3d 633, 307 N.E.2d 638, we believe that if defense counsel had been permitted to probe to this depth into the witness' background, it could have "becloud[ed] the main issues and obscure[d] the question of guilt or innocence of the accused from the purview of the jury." 17 Ill. App. 3d 633, 638, 307 N.E.2d 638, 643.

While it is true that convictions of crimes not infamous are admissible if offered to show bias or motive to falsely testify (*People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835), defendant did not show that the 1975 arrest for prostitution would "reasonably tend to indicate that [her] testimony might be influenced by * * * a motive to testify falsely. [Citation.]" (28 Ill. 2d 396, 401, 192 N.E.2d 835, 837.) Defense counsel was not attempting here to question Nash about the existence of criminal charges against her which stemmed from the same incident leading to defendant's arrest as in *People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708.

■■ Defendant also argues that since Nash's occupation was prostitution, he was entitled to question her about her occupation. During voir dire examination, however, Nash denied that prostitution was her occupation.

Thus, defendant's reliance on cases holding that occupation is a proper subject of impeachment is misplaced. We believe the trial court's ruling was not an abuse of discretion resulting in manifest prejudice.[2]

### III.

Defendant next contends that it was reversible error for the trial court to deny him the right to have the jury instructed on withdrawal from accountability.[3] The State argues that defendant was not entitled to the instruction since there was no evidence of his withdrawal from participation in the incident.

The statutory section defining withdrawal provides:

" [A] person is not ° ° ° accountable ° ° ° if:

° ° °

(3) Before the commission of the offense, he terminates his efforts to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense. Ill. Rev. Stat. 1975, ch. 38, pars. 5—2(c), 5—2(c)(3).

■■ A defendant is entitled to an instruction on withdrawal when, at trial, there is some evidence adduced that defendant: (1) terminated his efforts to promote the crime and (2) made an effort to neutralize the effect of his conduct as set forth in the statute. (*People v. Cooper* (1975), 30 Ill. App. 3d 326, 332 N.E.2d 453, *cert. denied* (1976), 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2206.) Here, to support defendant's instruction argument, defendant relies only on one sentence in his statement to the police: "Then something changed my mind, and I went to get some cigarettes." Defendant ignores a substantial portion of the statement in which he admits he was intending to "do it" himself, that he held the gun, that he walked with the other two men after deciding to rob someone, and that he returned to a point near the scene and watched the incident take place.

We do not believe that defendant's statement is sufficient evidence

---

[2] We note that evidence of Nash's arrest and conviction for theft in 1977 and pending theft charge were introduced and during closing argument defendant urged that Nash had a motive to falsely identify defendant. Thus, defendant argued that Nash was subject to police pressure because "she was in need of such help ° ° ° having problems with police ° ° ° [and] pointed [defendant] out to stop the process of interrogation to help herself. ° ° ° "

[3] "A person is legally accountable for the conduct of another when:

° ° °

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).

of withdrawal from the criminal activity such that defendant was entitled to the instruction he sought. As in *People v. Cooper*, there is not evidence here that defendant wholly deprived his prior efforts of effectiveness, or gave timely warning to the police, or otherwise made any effort to prevent the commission of the offense. (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)(3).) According to defendant's statement, he changed his mind, but made no effort to stop the crime. In fact, he returned and watched the crime occur without ever once attempting to dissuade his companions from committing the offense. As our supreme court has held:

> "[i]t is the communication of intent to withdraw and not the naked fact of withdrawal that determines whether one who advised, encouraged or incited another to commit a crime is to be released from liability as an accessory before the fact. [Citations.]" *(People v. Rybka* (1959), 16 Ill. 2d 394, 406, 158 N.E.2d 17, 23.)

In *People v. Brown* (1962), 26 Ill. 2d 308, 313, 186 N.E.2d 321, 324, the supreme court added a further requirement: the withdrawal must be timely so as to

> " 'give his co-conspirators a reasonable opportunity, if they desire, to follow his example * * * ,' and it must be possible for the trier of fact 'to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act * * * is in the process of consummation or has become so inevitable that it cannot reasonably be stayed.' [Citations.]"

Thus, even if we accepted as true defendant's statement that something changed his mind, it is of no consequence that he left the scene before the shooting took place. Defendant knew his companions were armed and he is deemed to have known they would use their weapons if resistance was met. Where conspirators contemplate that violence may be necessary to enable them to carry out their conspiracy or common purpose, all are liable for the acts done in furtherance of the common objective, and where death results from the prosecution of the common objective, all are equally guilty of murder, whether or not each is present during the commission of the crime. *People v. Brown* (1962), 26 Ill. 2d 308, 186 N.E.2d 321.

■■ We conclude, therefore, that since there was no evidence presented to show that defendant made any effort to neutralize the effect of his conduct and, therefore, there was no evidence of the second element of withdrawal, the trial court properly refused to give the tendered instruction. *People v. Cooper* (1975), 30 Ill. App. 3d 326, 332 N.E.2d 453, *cert. denied* (1976), 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2206; see also *In re Weigler* (1976), 37 Ill. App. 3d 478, 346 N.E.2d 171.

## IV

Defendant next contends that the prosecutor's comments during closing argument substantially prejudiced defendant's right to a fair trial. The State argues that since defendant failed to object to these comments at trial, he has waived any error for purposes of appellate review.

While it is true that defendant's failure to object to improper comments during closing argument generally results in waiver of the error on appeal (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838), if the error affects substantial rights, it is "plain error" and may be considered on appellate review. (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a).) Defendant argues that the prosecutor's seven references to the State's evidence as "uncontradicted" or "uncontroverted" was intended to indirectly comment on defendant's failure to testify and therefore requires reversal.

■■ By statute (Ill. Rev. Stat. 1975, ch. 38, par. 155—1) and by Federal Constitution (see *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229), the court and the prosecutor are forbidden from making any direct reference to a defendant's failure to testify. (*People v. Burton* (1969), 44 Ill. 2d 53, 254 N.E.2d 527.) The prosecution may, however, refer to the fact that the testimony of the State's witnesses is uncontradicted even though the defendant is the only person who could have contradicted it. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.) The test to be applied in such a situation is whether the references were " 'intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify?' " *People v. Mills* (1968), 40 Ill. 2d 4, 8, 237 N.E.2d 697, 700.

■■ At the outset, we note that portions of the State's evidence were contradicted. Nash testified that she saw defendant struggling with the victim while defendant's statement to the police claims that he was watching his two companions struggle with the victim. Thus, Nash's testimony was not unrebutted and uncontradicted. We do not believe, however, that the State's improper characterization requires reversal in view of the overwhelming evidence of defendant's guilt. (*People v. Acker* (1970), 127 Ill. App. 2d 283, 262 N.E.2d 247; also *People v. Hopkins* (1972), 52 Ill. 2d 1, 284 N.E.2d 283.) Accordingly, we hold that the prosecutor's comment were harmless error at most. Elimination of the error would not have avoided the conviction.

Defendant also argues that the prosecutor's characterization of defendant as a "coward" and an "animal" requires reversal. Defendant also contends that the following comment necessitates reversal: "Well, counsel asks for due process. Mr. Leben didn't get due process. I ask you to give him the due process he deserves."

In order to merit reversal, the prosecutorial misconduct must be of such a nature that the verdict would have been different had the

prosecutor refrained from making the comment. (*People v. Trice* (1970), 127 Ill. App. 2d 310, 262 N.E.2d 276.) Thus, the comments must have been a material factor in the conviction. *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

■■ In our view, these comments, while not condoned by this court, were not a material factor in defendant's conviction. It is well established that, during summation, a prosecutor may delve into the evil effect of crime, urge the fearless enforcement of the criminal laws, or remark upon the conduct of the accused. (*People v. Holmes* (1976), 41 Ill. App. 3d 956, 354 N.E.2d 611.) Accordingly, we hold that the prosecutor's comments here do not require reversal.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.