THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RANDALL KRAMAN, Defendant-Appellant.

First District (5th Division)    No. 79-406

Opinion filed May 15, 1981.

Gerald M. Werksman, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Mark E. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and sentenced to a term of imprisonment of 14 to 20 years. On appeal, he argues that (1) statements allegedly made by him were obtained from him in violation of his fourth, fifth and sixth amendment rights; (2) the court erred in denying a motion for a mistrial after prosecutorial comments; (3) the court abused its discretion in refusing to fulfill a jury request for transcripts; (4) the court erred in refusing to give a jury instruction; and (5) the juvenile court erred in waiving its jurisdiction over defendant. We affirm. The pertinent facts follow.

At the hearing on the State's motion to permit prosecution of defendant because of his age under the criminal laws, Officer Donald Janke testified that at approximately 7 a.m. on November 7, 1977, he proceeded to Madison School where he spoke with the custodian. He was directed to

the place where the custodian discovered the body of Andrea Sax. He observed the body in the bushes but did not see any signs of a struggle, or blood in the vicinity.

Officer John Ryan testified that when he arrived at the scene he observed the body lying near some bushes. On the south side of the building, the officers found tire tracks, a knife, a purse and several personal belongings of the victim.

At 7 p.m. on November 7, 1977, he was present in the police station when defendant was being fingerprinted. He did not say anything to defendant but defendant said to him: "What would you do with a kid that's as f____d up as me?" He later overheard defendant tell the officer who was fingerprinting him that she was evil and that someone had to do it.

Dr. Robert Stein testified that he performed an autopsy on the body of Andrea Sax on November 7, 1977. The cause of death was stab wounds to the neck and chest with perforation and laceration of the carotid artery and the aorta. He found 24 incised wounds on the head, neck, shoulder, chest and back, of which he identified 6 as stab wounds.

Officer William Zerfass testified that he is a juvenile officer with the Skokie Police Department. On November 7, 1977 he first went to the scene where the body was found and then to the area where the victim's car was located. Several police officers and four young people, whom he identified as Laura King, David Gerber, Julie Derichs and defendant were present. These young people accompanied him to the police station, where he spoke with them individually.

King told Zerfass that on the morning of November 7, 1977, she was late for school because defendant failed to appear at the place where they normally met to walk to school. She walked to defendant's house and they walked to school. On the way, he pointed out a car belonging to Andrea. At school, she, defendant, Derichs and Gerber met in the cafeteria and discussed the disappearance of Andrea, whereupon defendant commented that he thought that he had observed her car parked on a side street enroute to school. They encountered a police car after leaving the school and directed the officer to where the police found Andrea's car.

Zerfass interviewed defendant, who told him that the last time he saw Andrea was on November 6, 1977, as he and Tony Genc were riding their bicycles. They conversed with Andrea in front of her house and then the three of them decided to go for a ride in Andrea's car. They drove around for an hour and returned to Andrea's house, where he and Tony picked up their bicycles and departed.

At 9 p.m. that evening, defendant received a telephone call from Andrea. She was upset and wanted to come and speak with him. When she did not appear, he telephoned Mrs. Sax at 10 or 10:15 p.m. and told

her that Andrea never showed up. He made another telephone call and then left to meet Tony Genc.

Officer Zerfass noticed blood stains on defendant's pants. Defendant stated that the pants belonged to David King and he agreed to turn them over to the police.

Ramazon "Tony" Genc was brought to the station and interviewed by Detective Dennis Degelmann, who informed Zerfass of the contents of their conversation. Genc denied being with defendant or Andrea on November 6, 1977, and claimed that he had spent the evening with Howard Getner from 6:30 to 11 p.m. He further denied knowing defendant and claimed that he had been staying in Room 221 of the Holiday Inn. The officers checked the hotel and found that Genc was not staying there, whereupon they brought defendant back to the station to identify Genc.

Genc was interviewed again at 6 p.m. on November 6, 1977, and indicated that he was walking near the "7-11" at Lincoln Avenue and Gross Point when he encountered defendant driving Andrea's car. He got in and defendant told him that he had killed Andrea and offered to show him the body. He declined to go but defendant drove anyway to Madison School and he observed the body lying in some bushes. He indicated that he saw defendant throw the knife away and scatter Andrea's belongings. They drove away and parked the car before returning to defendant's home.

Zerfass said that he and a detective proceeded to defendant's home, where he was arrested in the presence of his parents. He was advised of his rights and his father accompanied him to the station. Defendant and his father indicated that they wanted to speak with their attorney and did not wish to make a statement.

Getner was questioned by the police and indicated that he had met defendant on October 28, 1977, at defendant's home. On that day, he indicated that he was returning from work when they encountered Genc and Edgar Dones. They conversed and Genc went to get something to eat. He and Edgar picked up his car and they went out looking for Genc, where they found him with defendant. Defendant suggested that they all go to his home. They went into the basement of defendant's home, where they found a knife and threw it for awhile before smoking some pot. Getner identified the knife as the one discovered by the police near Madison School.

Zerfass interviewed Dones, who related the same account as Getner. Dones further stated that defendant demonstrated to him how to kill with the knife by grabbing someone by the back of the head and striking the person in a downwardly manner in the head, shoulder and neck. Dones also indicated that defendant mentioned Andrea in the course of the

demonstration, but he did not know the context in which it was used. He also indicated that the knife had "Chicago" written on it. Zerfass stated that the knife found near the school had the words "Chicago Cutlery" on it.

Officer Carl Cacioppo testified that he was present at the police station while defendant was being held in a detention room. He entered the room to check on him, whereupon defendant looked up and said, "She got what she deserved." He responded, "Who?" and defendant replied, "You and I both know who." He again asked, "Who?" and defendant said, "Andy, I killed her." Cacioppo informed Zerfass of this statement.

Shirley Sax, Andrea's mother, testified that Andrea received a phone call from defendant around 9 p.m. She told her she was going to visit him and left home around 9:15 p.m. Defendant called the house around 10:15 p.m. that evening and stated that Andrea never showed up at his house. Mrs. Sax asked him to help look for Andrea by tracing the route to his house and to call some of her friends. She called the police around 11 p.m. to report Andrea missing and while she was talking, defendant called on her second telephone line. Her other daughter talked to defendant and later told her that defendant stated that maybe Andrea was "cruising around" and "what's the big deal that she's talking to the police?"

The juvenile court found that there was sufficient evidence upon which a grand jury could return an indictment; the offense was committed in an aggressive and premeditated manner; defendant was 16 years old; the evidence before the court established that there were no facilities particularly available to the juvenile court adequate for the treatment and rehabilitation of defendant; the clinical evaluations of defendant indicated a disposition which made him aggressive and dangerous under certain circumstances and as such, treatment for rehabilitation might require custody or supervision beyond his minority; and that the interests of the minor and the public required transfer for prosecution as an adult.

## Motion to Suppress

Defendant began his hearing in the criminal division with a motion to suppress certain statements. Zerfass testified that defendant was advised of his *Miranda* rights at the time he was arrested and at the station after his arrest. Defendant and his father then indicated that they wished to confer with an attorney. The attorney, Alan Lapping, conferred with his client and advised Zerfass that defendant did not wish to talk with the officers.

Defendant was transported to the juvenile detention center at approximately 11 p.m. on November 7, 1977. Zerfass indicated that he did not direct any questions to defendant; however, defendant did ask if he

would be able to get help where he was going and whether he would be able to face reality when he got out. He asked defendant what he was talking about and he responded, "for doing what I did." After a period of silence, defendant stated, "Why did I do it?" Another period of silence ensued and defendant stated, "What I did was wrong." and later stated again, "Why did I do what I did?" Zerfass indicated no further statements were made then before their arrival at the center.

Cacioppo repeated his testimony concerning defendant's admissions while he was held in the detention room at the station.

Sergeant Gary Reiter testified that as he escorted defendant to the washroom, he asked, "What is going to happen to me?" He responded, "We'll try to get you some help," and defendant answered, "I'm sick, I need help." Reiter was aware that defendant's attorney did not want him questioned.

Officer Robert Mason testified that after he fingerprinted defendant, he stated in the presence of two other officers, "What do you do with a kid like me? I'm really f____d up." While he fingerprinted defendant a second time, he asked him why he did it, to which defendant responded, "Someone had to do it." After a period of silence, defendant stated, "She was evil. She messed up a lot of lives. Now that I have straightened her out, who is going to straighten me out?" Mason indicated that at the time he fingerprinted defendant he did not have knowledge of any facts relating to this case; all he knew was that defendant was a suspect in a murder investigation.

Det. Degelmann testified that he interviewed four persons, including the defendant, who had come forward with information relating to the murder of Andrea Sax. After he interviewed Genc, he stepped out of a room and observed defendant standing in the hallway of the police station. He did not say anything to him, but defendant asked him, "What do you do with a guy like me, a guy who has killed someone?" He did not respond.

The court sustained the motion in part and denied it in part, finding that defendant was given *Miranda* rights at the time of his arrest at his home and indicated he understood these rights; he was also given his rights at the station; and he had the benefit of having his father and later his attorney present at the station. As such, statements given prior to his arrest were voluntary and had been initiated by him appearing to be a citizen furnishing information to a police officer. The statement to Cacioppo, "She got what she deserved," was voluntary and initiated by defendant and thus admissible. All statements which followed Cacioppo's response were suppressed. The statements to Reiter were voluntary and initiated by defendant; the statement, "What do you do with a kid like

me? I'm really f____d up" was an admissible voluntary statement; the statement made to Degelmann, "What do you do with a guy like me, who has killed someone," was a voluntary admissible statement; and the statement to Zerfass, "Will I be able to get help where I'm going; When I get out, will I be able to face reality?" was also considered a voluntary statement. All other statements were suppressed.

Defendant also filed a motion to suppress evidence which concerned a letter written by defendant to his girlfriend while in custody at the station which was seized by Zerfass. Zerfass entered the detention room where defendant was being held and observed him writing on a piece of paper that he obtained from his mother. The court denied this motion finding that probable cause to arrest was present. The court also denied his motion to dismiss the indictment.

*State's Case*

Officer Steven Anton testified that he collected the physical evidence from the area of the murder. He also noted tire tracks in the shape of a donut.

Officer Steven Neihaus testified he was on patrol at the Niles West High School when he was approached by four youths, one of whom was defendant. Defendant told Neihaus that he believed he saw Andrea's car at an intersection on his way to school. Neihaus stated that defendant also told him that Andrea had called him at 9 o'clock the previous night and indicated that she was upset because she felt responsible for her father's illness and asked if she could come over and talk with him. When Andrea did not arrive, he called the Sax' residence and spoke to her mother. The defendant also stated that Andrea was known to hitchhike. He was directed to the location of the car by defendant and later drove him and the other youths to the station.

Mrs. Sax testified essentially the same as she had at the juvenile transfer proceeding.

Zerfass also testified substantially as he had at the earlier proceedings.

Getner testified that on November 6, 1977, at 7:45 p.m., Genc arrived at his house alone. He had a knife sticking out of his pants, which he took from him and placed it in the kitchen. Genc left approximately 1 hour and 15 minutes later without the knife. His parents turned the knife over to the police the following morning.

Michael Podlecki, a forensic scientist, gave testimony relating to blood and hair analysis. He identified both Andrea's and defendant's blood type as group A. He determined that the red substance with imbedded hair on the knife was human blood, group A; and found that the red stains on defendant's bluejeans were type A human blood.

Cacioppo stated that while defendant was in the detention, he went in to check on him and heard him state, "She deserved what she got."

Genc testified that he, Doug and Getner were present in defendant's home on October 28, 1977, when defendant demonstrated how to kill someone by pulling his hair back and pretending to stab him in the neck. He moved into defendant's home that night and was still there on November 6, 1977.

He and defendant were riding their bicycles in the afternoon of November 6, 1977, when they stopped and talked with a girl whom he later found out was Andrea. The three of them went for a drive in her car for several hours and then returned to her home. He and defendant then rode their bicycles back to their home. On the way, defendant told him, in reference to Andrea, that "He wished the b____ would get off his back," and that "he didn't want to screw her."

When they returned to the house, defendant told him he was going to his girlfriend's to do homework and would meet him at the "7-11" store at 11 p.m. Genc observed him leave the house carrying a knife, which he had earlier identified. Defendant told Genc that he was taking the knife for protection against "bullies."

Tony then went to Getner's house carrying a knife which Getner took away. He left his house around 8:45 p.m. without the knife to just go walking. Later that evening he walked to the "7-11", arriving at 10 p.m. to meet defendant. Defendant arrived at 10:30 p.m. driving Andrea's car alone. He got in and asked defendant what he was doing with Andrea's car. Defendant replied, "I killed her," and showed him the knife, on which he observed bloodstains. He declined defendant's offer to show him the body but defendant drove to the school anyway, parking the car at the Madison School on the grass under a tree. As they exited the car, defendant wiped the gearshift, steering wheel, seat and door with his jacket. When Genc observed the body in the bushes, he ran back to the car. Defendant threw the knife and another object on the grass. Defendant made donut marks with the car in the grass and then drove to Jamaica Gardens, where he parked the car. He wiped the car again and they began walking home when defendant changed his mind and returned to the car and drove it to Parkside and parked it there.

Genc stated that he was questioned by the police the following afternoon, wherein he denied knowing defendant and staying at his home. He claimed he was staying at the Holiday Inn and was at Getner's house until 11:30 p.m. After officers determined these statements were false, he admitted knowing defendant.

On November 7, 1977, Genc was charged with concealing a homicidal death; however, pursuant to an agreement with the State's Attorney's office, it was dropped in return for his testimony.

Degelmann testified essentially as he had at the hearing on the motion to suppress evidence.

*Defense*

Officer Robert Heinze testified that he was on patrol in Chicago at 2 a.m. on November 7, 1977, when he noticed an automobile with an unusual 3-letter 3-digit license plate. He remembered the letters as "PMA" and observed a white male, 15 or 16 years old, as a passenger in the car, but could not see the driver. After he heard a radio report about a homicide in Skokie, he telephoned the Skokie Police Department.

Janet Boberg testified that she accompanied some friends over to defendant's house on November 7, 1977, at approximately 10:15 a.m. She heard defendant say to Genc, "I've got to talk to you." Genc asked what he wanted to talk about and defendant answered that he wanted to talk about Andrea. Genc asked him if he had said anything and he replied that he had not. Genc then stated that if defendant did, he would beat his face in.

OPINION

Defendant initially argues that the court improperly denied his motion to suppress certain statements. Following a hearing on defendant's motion, the court held the following statements were admissible:

(1) Officer Cacioppo testified that defendant told him, "She deserved what she got."

(2) Officer Mason testified the defendant said: "I am all f____d up, what do you do with a kid like me."

(3) Officer Degelmann testified the defendant said: "What do you do with a guy like me, a guy who has killed someone?"

(4) Officer Zerfass testified that on the ride to the Audy Home, defendant asked: "If he would be able to get help and when he got out if he would be able to face reality." The court suppressed those statements which were elicited directly in response to police interrogation, which had been prohibited by his attorney. However, defendant argues that all of his post-arrest statements were the direct result of his arrest, the legality of which was not determined by the court, and under *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, police are prohibited from making a warrantless, nonconsensual entry into a suspect's home in order to make a routine felony arrest.

■■ The State contends that the court was not required to rule on the legality of defendant's arrest since defendant did not properly present a motion to quash his arrest. However, the record discloses that defendant inserted a paragraph in his motion to suppress statements alleging that he was "detained without probable cause, reasonable grounds for his arrest,

lawful authority, or a lawful arrest warrant." While the trial court did not make a determination of the probable cause issue at the hearing on defendant's motion to suppress statements, it did when it considered his motion to suppress certain physical evidence. At that hearing, defendant's father testified that when Zerfass came to his home on November 7, 1977 at 6 p.m., he arrested defendant without a warrant. As such, once the evidence disclosed that defendant was arrested without a warrant when he was not violating any laws, the burden of going forward shifted to the State. (*People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135; *People v. McClinton* (1978), 59 Ill. App. 3d 168, 375 N.E.2d 1342.) The State was required to prove that the arresting officer had knowledge sufficient to warrant a man of reasonable caution to believe that an offense had been committed and that the person arrested had committed the offense. *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356; *Richmond.*

■■ Zerfass' testimony concerned the discovery of Andrea's body, defendant's pre-arrest statements in regard to his activities with Andrea on November 6, 1977, his participation in the discovery of Andrea's body, the observation of blood on defendant's pants during an interview at the police station, and Genc's statements implicating defendant in the murder. The trial court properly found there was probable cause, and there is no indication in the record that the trial court's finding would have been different had it occurred in the earlier proceeding.

Defendant's contention that his arrest was illegal, in light of the ruling in *Payton*, is also without merit. He argues that even if probable cause is present, an arrest cannot be made in a person's dwelling without a warrant in the absence of exigent circumstances. In *Payton*, police attempted to arrest a suspect in his home 3 days after the murder of a gas station manager. When no one answered the door, the police used a crowbar to gain entry, but no one was inside. In the second *Payton* case, the police arrested a suspect for two 3-year-old armed robberies two months after they obtained his address. The suspect's 3-year-old son opened the door for the police to enter, and the suspect had no opportunity to either consent or object. The Supreme Court held that the fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. The court specifically excluded from its consideration entries accompanied by consent.

■■ An arrest warrant is a desirable means to protect an individual's right to privacy. (*Payton; People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608.) However, when an arrest is effected based on probable cause and voluntary consent is given to enter one's residence, there are no constitutional violations of defendant's rights under the fourth amendment, even

in the absence of exigent circumstances. (*Bean.*) The standard for valid consent in a variety of circumstances is whether the consent is voluntarily given. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041; *People v. Bean*; *In re Willis* (1980), 89 Ill. App. 3d 347, 411 N.E.2d 1126.) Consent need not be given by defendant but may be obtained from a third party who has control over the premises. *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988; *People v. Bean*; *People v. Ford* (1980), 83 Ill. App. 3d 57, 403 N.E.2d 512.

In this instance, the warrantless entry of the police into defendant's home was clearly consensual. According to defendant's father's own testimony, upon the officers identifying and asking to see defendant, he called for defendant to come to the door, where he was then placed under arrest. There is no violation of the *Payton* rule here, and thus defendant's arrest, based on probable cause and with consent to enter his home, was lawful.

■■ Subsequently, defendant's volunteered statements, not elicited in response to any direct interrogation, were properly admissible. A determination by the trial court that a statement by defendant is voluntary will not be disturbed on review unless that determination is contrary to manifest weight of the evidence. (*People v. Diercks* (1980), 88 Ill. App. 3d 1073, 411 N.E.2d 97; *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098.) Our review indicates the court's determination was not against the manifest weight of the evidence. Defendant was advised of his constitutional rights at home and at the station, his father was permitted to accompany him to the police station and he was permitted to confer with his attorney in private. After his attorney requested no interrogation of his client, police did not initiate any questioning but only responded with questions to defendant's volunteered statements. Defendant himself "let the cat out of the bag" as he was neither pressured nor induced to make any statements.

Defendant next contends that the court erred in denying a motion for mistrial after the prosecutor twice commented on his failure to testify.

During final closing argument the prosecutor stated the following to the jury:

"Where is the defendant's blood soaked jacket that he wiped that car repeatedly with? The one he was wearing when he murdered Andrea Sax? Where is it? Who do you suppose is the best person to ask that question?"

Thereafter, in commenting on defense counsel's explanation and interpretation of the defendant's alleged statement to Officer Cacioppo, the prosecutor stated:

"He didn't say he felt guilty about bringing them together. What did he say? He says, she deserved what she got. She deserved what

she got. That is what Randy had to say about Andrea. Not that he felt guilty that she was dead. She deserved what she got. That is uncontradicted that he said that, she deserved what she got."

Defendant's objections were preserved and his later motion for a mistrial was denied. The State argues that the first comment was invited by defendant's remarks in closing argument as to the whereabouts of his jacket. Defense argues that Genc should have told police where it was since he stated that defendant was wearing it at the time he showed him Andrea's body, and used it to wipe off her car. In regards to the second comment, the State contends that this comment was permissible because it was not intended or calculated to direct the attention of the jury to defendant's failure to testify, even though defendant was the only person who could contradict it.

■■ ■ It is well established that the Fifth Amendment privilege against self-incrimination forbids comment by the State on defendant's failure to testify on his own behalf. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; *People v. Burton* (1969), 44 Ill. 2d 53, 254 N.E.2d 527.) While it would seem from the record that defense counsel's remarks relied upon by the prosecutor as to the first invited comment did refer to an analysis of Genc's testimony, and the State's comment was therefore improper, it does not appear that such improper comment necessitates reversal when the evidence overwhelmingly demonstrates defendant's guilt. (*People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771; *People v. Lawson* (1980), 86 Ill. App. 3d 376, 407 N.E.2d 899.) Elimination of this error would not have avoided the conviction. See *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

■■ In the second instance, our courts have allowed the prosecution to refer in closing argument to testimony of their own witnesses and point out that their testimony has not been contradicted, even when the only person who might have contradicted it was the defendant. (*People v. Hopkins* (1972), 52 Ill. 2d 1, 284 N.E.2d 283; *People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697; *People v. Richard* (1980), 90 Ill. App. 3d 322, 413 N.E.2d 5.) The test is whether the references were " '* * * intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' " (*Mills*, 40 Ill. 2d 4, 8, 237 N.E.2d 697, 700.) The prosecution's comment on defendant's alleged statement to Cacioppo was not a comment on his failure to testify but a permissible inference of what the evidence showed (*People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339), and thus there was no error in denying defendant's motion for a mistrial.

Thirdly, defendant maintains that the court abused its discretion when it refused to provide to the jury, upon request, transcripts of the testimony of Mason and Degelmann. During jury deliberations, the court

received an inquiry from the jury asking to see transcripts of the testimony of the witnesses and certain exhibits. The court stated that by agreement in the record between counsel for the State and defendant, the jury should be apprised that they should rely on their own memories. The next day, the jury requested to see transcripts of the testimony of Mason and Degelmann. After hearing oral arguments from counsel, the court denied the request based upon the agreement of counsel reached previously on the earlier request.

Defense counsel argues that the jury's request for the rereading of the testimony was significant as there was a genuine conflict between the testimony of Mason and Degelmann. Mason had indicated that while he was fingerprinting defendant, he heard defendant state, "I am all f___d up, what do you do with a kid like me?" He did not observe defendant talk to any other officer. Degelmann testified that as he observed defendant in the hallway and while wiping his hands, he said, "* * * what do you do with a guy like me, a guy who has killed someone?" Degelmann wrote in his police report that the statement was made to Mason while he was fingerprinting the suspect.

It is well settled that it is within the discretion of the trial court to allow or refuse a jury's request for review of testimony and discretionary matters will not be disturbed on appeal absent an abuse of discretion. *People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577; *People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931.

■■ In the pending matter, defense counsel acquiesced in the court's denial of the first request for a transcript of the testimony of the witnesses, which presumably included Mason's and Degelmann's testimony, as it was agreed that the jury should rely upon their own memories. In the second instance, the court heard arguments from both sides and believed that the second request was not substantially different from the first. The testimony in the case was voluminous and the court was concerned that no special emphasis be placed on the testimony of these witnesses, and counsel for both sides had previously agreed in regards to the earlier request that the jury should rely upon their own memories. Additionally, it appears that the denial here was not an essential factor in the determination of defendant's guilt in view of the overwhelming evidence against him in the record. (*People v. Tolbert* (1980), 81 Ill. App. 3d 977, 401 N.E.2d 1004.) As such, we do not believe that the trial court's decision to deny the request was an abuse of discretion. *Boyd.*

Defendant further maintains that the court erred in refusing to give an instruction stating the manner in which the jury should consider the testimony of Genc. Specifically, he requested the following jury instruction in light of the circumstances under which Genc testified:

"The testimony of a witness who provides evidence against the

defendant for personal advantage is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." (modified) Illinois Pattern Instructions, Criminal, No. 3.17 (1968) (hereinafter IPI).

Defense counsel's analysis of the evidence in closing arguments pointed to Genc as the likely suspect in the commission of the murder. Additionally, the State had agreed to drop the concealment-of-a-homicidal-death charge against Genc in return for his testimony. The trial court refused to give the instruction indicating that the basic credibility instruction, IPI Criminal No. 1.02, already agreed upon, adequately covered the subject matter. It stated:

"You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, and any interest, any bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

■■ We agree with the court. The modified "accomplice" instruction requested by defendant was not appropriate here. Our supreme court has defined "accomplice" as one who knowingly, voluntarily, and with common intent unites with the principal in the commission of a crime. The test is whether he could have been indicted for the offense. (*People v. Robinson* (1974), 59 Ill. 2d 184, 319 N.E.2d 772; *People v. Sanders* (1980), 86 Ill. App. 3d 457, 407 N.E.2d 951.) In light of this definition, the evidence does not indicate that Genc participated in the murder of Andrea or could be held accountable for it. We hold that the general credibility instruction was sufficient for the jury to evaluate Genc's testimony. Genc had already testified that he had been given immunity, and defense counsel, on cross-examination and in closing argument, could have adequately informed the jury of the inferences he wished them to draw. It is not error to refuse to give a tendered instruction relative to the testimony of an accomplice if a witness is not an accomplice under the test. *Robinson.*

Lastly, defendant argues that the Juvenile Court improperly waived its jurisdiction and abused its discretion in permitting his prosecution as an adult. We disagree. The Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 702—7(3)(a)) sets forth the factors to be considered in a juvenile transfer proceeding:

"In making its determination on a motion to permit prosecution under the criminal laws, the court shall consider among other matters: (1) whether there is sufficient evidence upon which a

grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority * * *." Ill. Rev. Stat. 1977, ch. 37, par. 702—7(3)(a).

■■■ On review, the appellate court's role is to determine whether, in light of the statutory criteria, the trial judge abused his discretion. (*People v. Thomas* (1981), 94 Ill. App. 3d 895.) No one criterion is determinative, nor is application of equal weight necessarily given to every criterion. All that is required is preservation of the record to allow meaningful review of the trial court's exercise of discretion. *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366; *People v. Cater* (1979), 78 Ill. App. 3d 983, 398 N.E.2d 28.

Our review of the record indicates that the trial court did consider all the statutory criteria in this determination. Not all of the factors set forth in the transfer statute need be resolved against the juvenile to justify transfer. The State only needs present sufficient evidence to warrant transfer in light of the statutory criteria. *Taylor.*

On balance, the evidence satisfies the criteria and was sufficient to persuade the trial court after a full hearing which included an evaluation of defendant's social and clinical reports indicating a tendency to be aggressive and dangerous under certain conditions that: there was sufficient evidence on which a grand jury could return an indictment; the alleged offense was committed in an aggressive and premeditated manner; defendant was then 16 years of age; there were no facilities available to the juvenile court which would be adequate for his treatment and rehabilitation; and it was in the best interests of public security and the minor that he remain in custody beyond his minority. As such, the court properly concluded transfer was warranted.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.