THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLARENCE SISTRUNK, Defendant-Appellant.

First District (3rd Division)   Nos. 1—88—3484, 1—92—2607 cons.

Opinion filed March 2, 1994.—Rehearing denied March 28, 1994.

Michael J. Pelletier and Patricia Mysza, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a bench trial, defendant Clarence Sistrunk was convicted of murder and attempted armed robbery. The trial court imposed a 36-year sentence of imprisonment for the murder conviction and a seven-year prison term for the attempted armed robbery conviction, the sentences to run concurrently.

On appeal defendant raises six issues: (1) whether the juvenile court erred in granting the State's motion to prosecute defendant as an adult when defendant was 14 years old at the time the offenses were committed; (2) whether defendant was denied effective assistance of counsel at trial on the ground that last-minute disclosures of the State's evidence prevented his defense counsel from performing as an effective adversary; (3) whether the trial court failed to adequately protect, and thereby denied, defendant's right to effective

assistance of counsel; (4) whether the 36-year sentence of imprisonment constitutes an abuse of the trial court's discretion; (5) whether defendant is entitled to 538 days' credit to his sentence for the time spent in custody from the date of his arrest to the time of his sentencing; and (6) whether the delay of defendant's appeal violates his due process rights to a criminal appeal and to effective assistance of counsel.

For the reasons which follow, we affirm defendant's convictions and modify his sentence to reflect 538 days' credit to his sentence.

On October 7, 1981, a cab driver, Hugh Smith, was fatally shot during an attempted armed robbery. Two days later defendant was arrested for Smith's murder. Subsequently, three codefendants (defendant, Frank Whiteside and Ricky Hughes) were indicted for offenses relating to Smith's death.

### JUVENILE COURT HEARING

On December 23, 1981, the juvenile court held a hearing to determine whether defendant should be tried as an adult. Defendant was born on October 21, 1966, and thus was only two weeks short of attaining his 15th birthday when the crimes were committed.

At the juvenile court hearing, Detective Geraldine Perry testified that she was present when two young men, Frank Whiteside and Calvin Delaney, gave statements implicating defendant in the Smith murder. Referring to the crimes, Delaney said he knew defendant and saw defendant, Frank Whiteside and Andre Stroy approach the cab. Delaney further stated that defendant went to the driver's side of the cab, pointed a gun at the cab driver and fired a shot. The cab then pulled away.

Whiteside, in his statement, said he was present during the time a robbery was planned and that he observed defendant go to the driver's side of Smith's cab and fire a gunshot after the demand for money.

Detective Perry also testified that she investigated an armed robbery of another cab driver, Reuben Rigs, that occurred on October 3, 1981. Rigs stated that he had been stopped by four young men and identified defendant in a lineup conducted on October 9, 1981, as the person who approached his cab, pointed a gun at his head and said "I'll kill you if you move."

Thomas Morgan, a probation officer, also testified at the juvenile court hearing. In anticipation of the transfer hearing, Morgan prepared a social investigation report about defendant after talking to defendant and his mother. Morgan testified that defendant had three prior findings of delinquency, *i.e.*, two burglaries and a theft. Morgan

admitted that he made a "big mistake" by indicating in his report that defendant was not the shooter. Morgan described defendant as streetwise but not manipulative and sometimes withdrawn and uncommunicative. He characterized defendant's actions as aggressive but not premeditated. Defendant resided with his mother in the Robert Taylor Homes. Morgan opined that defendant was not a problem inside the home and defendant and his mother had very loving and concerned attitudes toward each other. Defendant had not attended school in the previous year "due to people bothering him." In September 1981, defendant attempted to enroll in Tilden High School but was not accepted due to overcrowded conditions. According to defendant's mother, defendant could not attend DuSable School because defendant would not be able to cross gang lines. Morgan opined that defendant should not be tried as an adult.

Following the hearing the juvenile court granted the State's motion to try defendant as an adult.

PRETRIAL PROCEEDINGS

On December 30, 1981, defendant and two codefendants, Frank Whiteside and Ricky Hughes, were indicted for the murder and attempted armed robbery of Smith.

Sometime before November 15, 1982, Whiteside's trial had been severed from the joint trial of defendant and Hughes. At the hearing on November 15, 1982, the trial court denied the renewed motion for severance by Hughes.

Also at the November 1982 hearing, the State informed the court that it wanted to present evidence at trial that defendant was involved in a similar armed robbery of a cab driver at the same location just a half hour before the Smith murder and attempted armed robbery. The State argued that evidence of the prior armed robbery would establish identity, common scheme and design. The court eventually allowed the State to file an amended answer to discovery as to defendant to permit the additional introduction of possibly two witnesses regarding proof of the prior crime. The court ordered the State to facilitate the location of the additional witnesses for the defense counsel so that he could have a reasonable opportunity to contact these witnesses and investigate their backgrounds and testimony. The court ruled that the three codefendants would be tried simultaneously but separately by two juries (for Hughes and defendant) and the bench (for Whiteside). The trials were then scheduled to begin on December 15, 1982.

On January 6, 1983, the State filed a motion for continuance because it had been unable to locate certain material witnesses,

including Fred Taylor. Taylor was the cab driver who was the victim of armed robbery a half hour before the Smith murder.

On January 10, 1983, the State filed an amended answer to discovery which stated that it may call as witnesses Frank Whiteside and Fred Taylor. The address of Fred Taylor was also given.

On January 17, 1983, the parties appeared in court to commence jury selection. The State immediately informed the court that it was not going to proceed against Ricky Hughes on the murder charge and sought to amend its answer to discovery to include, as a witness for the State, Ricky Hughes, who had decided to enter into a plea agreement with the State. After this disclosure, the trial court recessed to give defense counsel an opportunity to discuss the matter with defendant and defendant's aunt who was in the courtroom. Following the recess, defense counsel answered ready and waived the jury. The trial court questioned defendant concerning his waiver of jury and heard testimony from defendant and his aunt concerning the jury waiver.

TRIAL

On January 18, 1983, the trial court first addressed defendant's motion to bar the testimony of Fred Taylor. On the preceding day, Taylor had identified defendant from a display of photographs. Defense counsel attended the identification procedure but argued that there was no opportunity to file any motion to suppress Taylor's identification as suggestive because the process only occurred the day before. Allowing Taylor to testify, the court expressed its concern regarding suggestive identification and advised defense counsel that it had no predisposition to accept identification testimony and that the issue could again be raised during the trial.

Taylor, the first witness at trial, then testified that on October 7, 1981, at 11 p.m. he was driving a cab when he was flagged down at 5400 South State Street by Andre Stroy. Defendant then opened the driver's side door, pointed a gun at Taylor and ordered him not to move. After defendant and Stroy relieved Taylor of his money, Taylor was allowed to drive away, a gunshot being fired at his cab door. Taylor reported this incident to the police on October 21, 1981, identified Stroy in a police lineup on the next day, and identified defendant from a photographic display on January 17, 1983, the day before trial commenced.

Henry McCree testified that at 11:30 p.m. on October 7, 1981, he observed the attempted robbery and shooting of a cab driver, Hugh Smith.

Frank Whiteside and Ricky Hughes, who were both 18 years old

at the time of trial, gave essentially the same testimony regarding the offenses. On the evening of October 7, 1981, Whiteside and Hughes were leaving their apartment building when they encountered defendant and Stroy. Defendant, who was holding a gun, told Whiteside that he had just robbed a cab driver and Stroy told Hughes about the same robbery. Whiteside and Hughes agreed to accompany defendant and Stroy in robbing another cab driver but refused to take defendant's gun.

Whiteside and Hughes flagged down a cab near 5500 South State Street and opened the passenger side door. While Whiteside and Hughes talked to the cab driver, defendant walked to the driver's side door, pointed his gun at the cab driver, demanded money and then shot the cab driver. Two days later Whiteside and Hughes were arrested and gave written statements to the police.

Whiteside and Hughes admitted that they had entered into plea agreements in which the State would dismiss the murder charges against them in exchange for their testimony at defendant's trial. The agreements further provided that the State would recommend a four-year prison sentence on the attempted armed robbery charge for Whiteside and an eight-year sentence on the same offense for Hughes.

Defendant denied robbing Fred Taylor, shooting a cab driver or having a gun. Defendant testified that on the evening of October 7, he was with his friend Grayland Martis, now deceased, at the apartment building when they encountered Whiteside and Hughes. Hughes displayed a gun from underneath his jacket and told defendant and Martis that he and Whiteside were going to make money off taxicabs. When asked to join in the venture, Martis refused and defendant remained silent. Defendant, with Martis, observed Whiteside and Hughes walking toward State Street around 11:15 or 11:30 p.m. Defendant then left Martis and returned home. The next day Martis told defendant that he (Martis) had witnessed Whiteside and Hughes shoot the cab driver and that Whiteside and Hughes were telling people that defendant and Martis had committed the murder.

At the close of trial, the court found defendant guilty of murder and attempted armed robbery.

### SENTENCING

On March 30, 1983, at the sentencing hearing, the State presented a witness, Reuben Rigs, in aggravation. Rigs, a cab driver, testified that at 3:15 a.m. on October 3, 1981, four days before the Smith murder, he was robbed by four males, including defendant. In the course of the robbery, defendant stood by the driver's side door and held a gun to Rigs' head. The Rigs robbery had previously been

presented through the testimony of a police detective (Perry) to the juvenile court during the transfer hearing. The State argued that a sentence of natural life should be imposed given defendant's prior juvenile record, the armed robbery of Rigs four days before the instant crimes, the armed robbery of Taylor about 30 minutes before the instant crimes, and the status of defendant as the trigger man in the murder and attempted armed robbery of Smith.

In mitigation, defense counsel argued that defendant resided in a horrible, abusive environment; that the credibility of Whiteside and Hughes is at issue; Whiteside and Hughes were equally involved in the crimes and were older than defendant; and that defendant was only 16 years old at the time of sentencing. Defendant declined to say anything in his own behalf.

The court sentenced defendant to 36 years' imprisonment for the Smith murder and a seven-year term for the attempted armed robbery conviction, the sentences to run concurrently. After imposing each sentence separately, the trial court admonished defendant that he had a right to appeal both the convictions and the sentences, that notice of such appeal had to be filed within 30 days of sentencing, that he was entitled to receive a free transcript and that a lawyer could be appointed for him if he were found to be indigent.

### EVENTS FROM SENTENCING TO APPEAL

We are required to provide a chronology of the sad events and mishaps that delayed consideration of defendant's appeal.

During the 1981 to 1983 proceedings, which included the juvenile transfer hearing, trial and sentencing, defendant was represented by experienced trial counsel. At sentencing on March 30, 1983, the trial court twice clearly explained defendant's right of appeal but there was no request for the appointment of appellate counsel and none was made.

Almost five years later, the failure of an appeal to be perfected was brought to the attention of trial counsel. On December 1, 1988, he filed a motion in the appellate court for leave to file a late notice of appeal, to appoint counsel from the public defender's office or the State Appellate Defender's office (SAD) and to award a free transcript of the proceedings in view of defendant's indigency. In his affidavit attached to the motion, trial counsel suggested that he assumed he had requested appointment of appellate counsel. The record, however, indicates the contrary. The motion also brought to the attention of the court that defendant had been a resident of the Robert Taylor Homes, was poorly educated with a history of school problems and that it was unlikely defendant understood the trial court's admonition as to his right to appeal.

On December 12, 1988, the appellate court entered an order which granted defendant leave to file a late notice of appeal, appointed SAD to represent defendant in his appeal, and ordered copies of the proceedings and the common law record to be furnished to defendant without costs or charge.

The next day, trial counsel filed a notice of appeal with the circuit court of Cook County. SAD, however, never received notice of appointment as counsel. When no record or briefs were forthcoming, the appellate court, *sua sponte*, dismissed defendant's appeal for want of prosecution on June 7, 1989, and the mandate issued on August 22, 1989.

On December 9, 1988, a circuit court judge ordered that defendant be provided free transcripts. From 1989 through 1991, defendant made inquiries about the status of his appeal to various offices and courts. In December 1988, the circuit court clerk's office informed defendant that his request for a free trial transcript had been granted, that his order had been forwarded to the official shorthand reporters' office, and that defendant should contact the reporter's office. In April 1989, defendant, on his own, filed with the circuit court a motion to proceed *in forma pauperis* and request free transcripts. In January 1990, defendant sent a letter to the office of the official shorthand reporter to inform them that he had not yet received his transcript as was ordered by the circuit order in December 1988. In February 1990, the reporter's office notified defendant that they had no such order and suggested that he contact his attorney regarding the status of his appeal. In August 1991, defendant apparently wrote a letter to the office of the Cook County public defender regarding his appeal. The Cook County public defender informed defendant that the trial court never appointed the office of the public defender to represent him and that his appeal had been dismissed by the appellate court on June 7, 1989. Somehow, in October 1991 the circuit court judge again entered an order finding defendant to be indigent and ordering the Cook County court reporter's office to transcribe defendant's trial and sentencing proceedings.

Enmeshed in this bureaucratic "Catch 22," defendant filed *pro se* a Federal *habeas corpus* petition in December 1991. During the course of the Federal proceeding, SAD received notice of the pendency of the action and on May 18, 1992, filed a motion with this court to recall the mandate issued August 22, 1989; to vacate the dismissal order of June 7, 1989; to reinstate defendant's appeal; and to appoint SAD as counsel on appeal for defendant.

On May 27, 1992, this court entered an order reinstating defendant's appeal. With great difficulty SAD reconstructed the rec-

ord, the parties filed their briefs and oral arguments were heard. All of the briefs were on file by March 13, 1993, and oral argument was heard on September 22, 1993.

OPINION

On appeal, defendant first asserts that the juvenile court erred in transferring him to stand trial as an adult because the juvenile court failed to consider his social history as it bore on his rehabilitative potential and whether the best interests of the minor and the public required that he continue in custody beyond his minority. We disagree.

At the time of defendant's transfer hearing, the Juvenile Court Act provided that a judge, acting on a motion by the State and following an investigation and hearing, could order a minor over the age of 13 to be prosecuted as an adult under the criminal laws. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3).) In making its determination, the juvenile court was required (and in fact still is required) to consider, "among other matters," the following six factors:

> "(1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority." Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a) (now codified at 705 ILCS 405/5—4(3)(b) (West 1992)).

A reviewing court must determine whether the juvenile court judge abused his discretion in evaluating the evidence in light of the statutory criteria. *People v. Taylor* (1979), 76 Ill. 2d 289, 300-01, 391 N.E.2d 366; *People v. Ollins* (1992), 231 Ill. App. 3d 243, 606 N.E.2d 192.

In a transfer proceeding, a judge is not required to enunciate a formal statement of reasons or conventional findings of fact but rather "must take care to preserve a record sufficiently explicit so that his exercise of discretion may be reviewed meaningfully." (*Taylor*, 76 Ill. 2d at 301.) No one factor is determinative and equal weight need not be given to each factor. (*People v. Kraman* (1981), 96 Ill. App. 3d 390, 404, 421 N.E.2d 346.) Moreover, not all of the statutory criteria must be resolved against the minor to justify a transfer. *Kraman*, 96 Ill. App. 3d at 404.

■ At the transfer hearing in the present case the judge heard testimony which revealed that two eyewitnesses saw defendant shoot the victim after attempting to rob him. Defendant was only two weeks shy of his 15th birthday when he committed the crimes with which he was charged. Regarding other crimes, testimony revealed that defendant committed the armed robbery of another cab driver named Rigs four days before the Smith murder and had three prior findings of delinquency for two burglaries and one theft. A probation officer informed the court that defendant resided in public housing, had a loving relationship with his mother, was not a problem at home but apparently did not attend school. This record presents sufficient evidence to support the juvenile court's order to transfer defendant to adult criminal court.

Second, defendant asserts that he was denied his right to effective assistance of trial counsel because the State disclosed certain evidence, *i.e.*, the testimony of Whiteside, Hughes and Taylor, shortly before trial was to start. Defendant contends that the disclosure of evidence so close to the time of trial made the likelihood that counsel could have performed as an effective adversary so remote as to have made the trial inherently unfair and thus prejudice should be presumed. Defendant directs our attention to *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, *Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55, and *People v. Wallace* (1982), 106 Ill. App. 3d 580, 435 N.E.2d 1322.

In rare circumstances ineffective assistance of counsel is legally presumed to result in prejudice where particularly grave factors exist. In *Powell*, the trial judge appointed "all the members of the bar" to represent the defendants at their arraignment. (*Powell*, 287 U.S. at 49, 53, 77 L. Ed. at 160, 162-63, 53 S. Ct. at 57, 58.) Six days after indictment, the defendants appeared without counsel for the commencement of trial. An attorney from Tennessee, not a member of the local Alabama bar, was present in the courtroom and informed the trial judge he was interested in the case and offered to assist appointed counsel. The Tennessee attorney further told the trial judge that he had not been employed by the defendants, had no opportunity to prepare a case and was not familiar with the procedure in Alabama. The trial judge then apparently accepted the Tennessee lawyer as counsel for the defendants. (*Powell*, 287 U.S. at 53-56, 77 L. Ed. at 162-64, 53 S. Ct. at 58-59.) The trials of the defendants were severed but each of the three trials was completed within a single day. *Powell*, 287 U.S. at 49-50, 77 L. Ed. at 160-61, 53 S. Ct. at 56-57.

The *Powell* court found that the defendants were not accorded

the right of counsel in any substantial sense given the collective designation of all bar members at the time of the defendants' arraignment, the dubious assignment of counsel on the morning of trial, the immediate commencement of trial, and the fact that trial counsel was present as a friend of people who were interested in the case, was not hired by the defendants, had no time to prepare and was unfamiliar with the local procedures.

Similarly, denial of effective assistance of counsel has been presumed where trial counsel first met the defendants on the very morning of trial, held only a short consultation with the defendants, and there was no indication in the record that trial counsel interviewed any of the State's witnesses or took any discovery. *Wallace*, 106 Ill. App. 3d 580, 435 N.E.2d 1322.

In *Cronic*, however, the United States Supreme Court rejected the defendant's claim of ineffective assistance of counsel where the defendant's retained counsel withdrew shortly before the scheduled trial date. In his place, the trial court appointed a young attorney with a real estate practice and no jury trial experience to represent the defendant, who was charged with criminal mail fraud. The trial court allowed the appointed attorney only 25 days for pretrial preparation even though the government had investigated the case for $4^{1}/_{2}$ years and reviewed thousands of documents over the time of its investigation. (*Cronic*, 466 U.S. at 649, 80 L. Ed. 2d at 661, 104 S. Ct. at 2041.) The Supreme Court held that the surrounding circumstances of the case made effective assistance of counsel unlikely.

■ The grave circumstances apparent in *Powell* and *Wallace* are simply not present in the case at bar. Defense counsel in the present case was not appointed by the court on the eve of trial but rather was retained by defendant and represented defendant for over a year before the commencement of trial. Defense counsel had adequate opportunity to conduct discovery before trial began. Whiteside's statement implicating defendant was brought out in the juvenile court proceedings in December 1981 and his name appeared as a potential witness on the State's previously filed list.

As to Taylor, the State informed the court at the November 1982 hearing that evidence of a prior similar crime would be presented, asked for a continuance on January 6, 1983, to locate Taylor, and included Taylor's name and address on its list of potential witnesses on January 10, 1983. Furthermore, defense counsel was present when Taylor identified defendant from a photographic display on January 17, 1983. In addressing defense counsel's motion to bar Taylor's testimony, the trial court expressly recognized defense counsel's concerns about the possible suggestiveness of the identification proce-

dure and ruled that defense counsel could raise the issue of suggestiveness during the course of the trial.

Regarding Hughes, the record reveals that defense counsel was well aware of the position taken by Hughes at least by the time of the November 15, 1982, hearing on Hughes' motion for severance. The parties discussed the inconsistency between the positions taken by defendant and Hughes. Defendant would claim that Hughes was the shooter and Hughes would assert that defendant pulled the trigger. Moreover, defense counsel was aware that Hughes had given a statement on October 9, 1981, two days after the Smith murder. At the November 15, 1982, hearing, defense counsel stated "I'm aware of what is in his [Hughes'] statement but I know definitely that Mr. Hughes will testify that [defendant] did the shooting." Accordingly, defense counsel knew of and had sufficient time to prepare for the unfavorable testimony of Hughes.

The record demonstrates that defense counsel had ample opportunity to prepare his case, and we find that the timing of the State's disclosure of certain evidence does not support defendant's claim of ineffective assistance of counsel.

Third, defendant contends that the trial court failed to adequately protect his right to effective assistance of counsel because it allowed the trial to proceed in the face of evidence disclosing possible attorney incompetence. According to defendant, the evidence of possible attorney incompetence arises from the defense counsel's statement that he may not be ready to proceed given the State's disclosure of Hughes as a witness on the morning trial was to start and the trial court's grant of only a one-hour recess for defense counsel to confer with his client and his client's aunt about the recently disclosed witness.

■ Since we find that defendant was not denied effective assistance of counsel under the circumstances of this case, we also find that the trial court did not fail to protect defendant's right to effective assistance of counsel. Moreover, the case on which defendant relies, *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173, involved conflict of interest concerns where one public defender was appointed to represent three codefendants and his motions to appoint separate counsel were not granted. The case at bar does not present any problem of joint representation of codefendants.

Fourth, defendant asserts that the 36-year sentence of imprisonment, although within the statutory guidelines for murder, constitutes an abuse of discretion because the trial court failed to consider his rehabilitative potential and his youth. We disagree.

■ Defendant was eligible for a term of life imprisonment. At the

time of defendant's sentencing, the statute provided a term of imprisonment of not less than 20 years and not more than 40 years or a life imprisonment term if, as here, the victim was murdered during an attempted armed robbery. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b), 1005—8—1(a)(1)(a),(b).) A sentence which falls within the statutory limits will not be disturbed on review absent an abuse of discretion. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641; *People v. Costello* (1992), 224 Ill. App. 3d 500, 510, 586 N.E.2d 742.

Contrary to defendant's assertions, the record reveals that the sentencing judge carefully balanced the mitigating and aggravating factors and did not abuse his discretion in imposing a 36-year sentence of imprisonment for the murder of a cab driver during an attempted armed robbery.

■ Fifth, the parties correctly agree that defendant is entitled to 538 days' credit to his sentence for the time spent in custody from the date of his arrest to the time of his sentencing. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—7(b).) Accordingly, this court amends the sentencing order to reflect a credit of 538 days.

Finally, defendant asserts that the extensive delay from the time of his sentencing (March 30, 1983) to the time of the prosection of his appeal constitutes a constitutional due process violation of his right to a speedy appeal. In conjunction with this issue, defendant contends that he was denied effective assistance of counsel in the appeal process because he attributes the first five years of the appellate delay to his trial attorney's failure to file a timely notice of appeal. Defendant claims that the appropriate remedies for being denied his due process right to a speedy appeal and to effective assistance of counsel are reversal of his convictions and release from prison. Alternatively, defendant asks this court to reduce his sentence by the length of the appellate delay, *i.e.*, about 10 years.

The State contends that a constitutional right to a speedy appeal should not be recognized because: (1) no legal precedent exists under decisions rendered by the United States Supreme Court or the Illinois Supreme Court to embrace the right to a speedy appeal; (2) a lengthy delay in processing a criminal appeal does not constitute a due process violation under decisions by the United States Supreme Court and the Illinois Supreme Court; (3) the United States Supreme Court has applied the due process and equal protection clauses of the United States Constitution in a limited fashion in the context of criminal appeals (*e.g.*, States must provide free transcripts, appoint counsel and waive filing fees for indigents, and must provide effective assistance of counsel for all defendants) which demonstrates that these clauses have limited application to criminal appeals; (4) the Illinois

legislature has not created a statutory right to a speedy appeal for a convicted criminal even though it has statutorily mandated the right to a speedy trial for an accused citizen (Ill. Rev. Stat. 1991, ch. 38, par. 103—5 (now codified at 725 ILCS 5/103—5 (West 1992)) (120-day rule)); and (5) the distinction between a right to a speedy appeal and a right to a speedy trial is rational because the status of a convicted appellant differs fundamentally from an accused citizen who is presumed innocent and entitled to certain rights.

By statute, Illinois grants a right of appeal to a defendant convicted of murder or a felony. Section 5—5—4.1 of the Unified Code of Corrections specifically provides:

> "The defendant has the right of appeal in all cases from sentences entered on conviction of first degree murder or any other Class of felony." Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—4.1 (now codified at 730 ILCS 5/5—5—4.1 (West 1992)).

Although the United States Constitution does not require the States to afford convicted defendants a right of appellate review, where a State creates an appellate process, "the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts v. Lucey* (1985), 469 U.S. 387, 393, 83 L. Ed. 2d 821, 827-28, 105 S. Ct. 830, 834.

Accordingly, Illinois' statutory right to an appeal is subject to the due process clauses of the Federal (U.S. Const. amend. XIV) and State Constitutions (Ill. Const. 1970, art. I, § 9).

Moreover, an argument could reasonably be made that a right to a timely appeal emanates from our Bill of Rights guaranteed in the Illinois Constitution under article I, section 12, entitled "Right to Remedy and Justice":

> "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and *promptly*." (Emphasis added.) (Ill. Const. 1970, art. I, § 12.)

This constitutional guarantee has not yet been construed in a criminal case and no arguments have been advanced by the present parties relating to it; however, if it has any real meaning in the context of our system of justice, it must surely refer to denial of prompt consideration of a criminal appeal.

Defendant submits, and the State admits, that various Federal Courts of Appeal have recognized a constitutional right to a speedy appeal and found due process violations where the appeal has been unreasonably delayed. See, *e.g.*, *Allen v. Duckworth* (7th Cir. 1993), 6 F.3d 458 (the first case in the seventh circuit which assumed that

excessive delay in the processing of an appeal can be a denial of due process); *Burkett v. Fulcomer* (3d Cir. 1991), 951 F.2d 1431 (18-month delay); *Elcock v. Henderson* (2d Cir. 1991), 947 F.2d 1004 (8 1/2-year delay); *Cody v. Henderson* (2d Cir. 1991), 936 F.2d 715 (9 1/2-year delay); *Coe v. Thurman* (9th Cir. 1990), 922 F.2d 528 (four-year delay); *Simmons v. Reynolds* (2d Cir. 1990), 898 F.2d 865 (six-year delay); *Rheuark v. Shaw* (5th Cir. 1980), 628 F.2d 297 (two-year delay in furnishing a record).

The State would have us disregard these Federal cases on the grounds that they are: (1) not binding authority on the State; (2) inapposite because they involve *habeas corpus* proceedings, not direct appeals as in the present case, and *habeas corpus* cases base their authority on a Federal statute which empowers Federal courts to act only when a defendant has no right to raise an issue in a State proceeding (28 U.S.C. § 2254(c) (1988)); and (3) factually distinguishable because they involve fact patterns in which the convicted defendant made diligent and continuous efforts to assert his rights while defendant in the present case did nothing to advance his appeal for five years after he was sentenced.

While we recognize the validity of the State's distinctions between the Federal cases and the case at bar, we cannot deny the validity of the principles established in the Federal cases. To grant a convicted defendant a right to an appeal by statute and then to minimize the right by taking it outside the ambit of due process would be unconscionable.

When determining whether a delay of a convicted defendant's appeal violates due process, the courts generally rely on four factors established in *Barker v. Wingo* (1972), 407 U.S. 514, 530-32, 33 L. Ed. 2d 101, 116-18, 92 S. Ct. 2182, 2192-93: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's responsibility to assert his right; and (4) the resulting prejudice to the defendant. *Harris v. Champion* (10th Cir. 1994), 15 F.3d 1538.

■ With these guidelines, we find that defendant must bear the responsibility for the first five years of delay. It is axiomatic that the right to an appeal envelops the corresponding duty of the appellant to assert an appeal. At sentencing, the trial court twice admonished defendant of his appeal rights. Defendant's understanding or misunderstanding of his trial counsel's action or inaction after sentencing cannot be attributed to the fault of the appellate system.

The system, however, failed defendant for 3 1/2 years based on the time period from when the appellate court granted defendant leave to file a late notice of appeal (December 12, 1988) to the time when the appellate court reinstated defendant's appeal (May 27, 1992).

Even assuming that the 3½-year delay constitutes a due process violation, the appropriate relief for such a violation depends on the defendant's showing of prejudice. As stated by the second circuit:

"While the state courts would recognize that an undue delay in the appellate process could violate a defendant's due process rights, [citations] they, like this Court ***, do not consider such a violation to be a ground for vacating the conviction unless the defendant can show that the delay resulted in prejudice to the appeal itself." (*Elcock*, 947 F. 2d at 1008.)

Notwithstanding an 8½-year delay in appeal, the second circuit in *Elcock* held that the defendant was not entitled to release because there was "no basis for concluding that the outcome of the appeal would likely have been altered by promptness in the appellate process." *Elcock*, 947 F. 2d at 1008.

Similarly, we find no reason to believe that the result of defendant's appeal in the present case would have been any different than our determination at this time. This court granted defendant leave to file a late notice of appeal and reinstated his appeal so that defendant's claims could receive substantive review. Under the circumstances of this case, such relief was appropriate and sufficient.

For all the foregoing reasons, we affirm defendant's convictions and we modify defendant's sentence to reflect 538 days' credit.

Affirmed in part; modified in part.

RIZZI and CERDA, JJ., concur.